378 S.E.2d 82

**COMMITTEE ON LEGAL ETHICS OF
the WEST VIRGINIA STATE BAR**

v.

**George R. TRIPLETT** ▮

No. 18396.

Supreme Court of Appeals of
West Virginia.

Oct. 26, 1988.

Rehearing Denied Dec. 20, 1988.

Jack M. Marden & Cynthia Santoro Gustke, Charleston, for West Virginia State Bar.

Frederick D. Fahrenz, Charleston, for George R. Triplett.

NEELY, Justice:

This is a disciplinary proceeding brought by the Committee on Legal Ethics of the West Virginia State Bar (the "Committee") against George R. Triplett, a member of the Bar. The Committee has recommended a six month suspension of Mr. Triplett's license to practice law for his alleged violation of DR 1–102(A)(4), (5), and (6) of the West Virginia Code of Professional Responsibility which provide:

> DR 1–102—Misconduct—(A) a lawyer shall not: (4) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (5) Engage in conduct that is prejudicial to the administration of justice; (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

The respondent failed to abide by regulations promulgated under the federal Black Lung Benefits Act, 30 U.S.C. 901 et seq., for the collection of attorneys' fees in black lung cases.

The regulations at issue in this proceeding require that any attorney fee be approved by the Department of Labor; consensual arrangements between lawyers and clients for contingent fees are prohibited. Mr. Triplett asked his clients to execute contingent fee contracts allowing him 25 percent of accrued benefits. He did not seek Department of Labor approval for these arrangements and sought no fee whatsoever from the Department. When his clients prevailed, they paid Mr. Triplett, who put the money into bank accounts in his name as agent, trustee, or "attorney on escrow" for the individual clients.[1] The committee found the respondent guilty of professional misconduct reflecting on his

fitness to practice law in violation of DR 1–102(A)(4), (5) and (6).

I

*Introduction*

Black lung cases are initiated when a miner files a claim with the Department of Labor (DOL). The claim is then reviewed at the administrative level by a claims examiner or the deputy commissioner, and approved or denied after a medical examination by a DOL doctor. The claimant and defendant operator (if one can be identified) are then allowed to submit additional evidence and have the case reconsidered, again at the deputy commissioner level. Either side can then appeal the decision of the deputy commissioner to the Office of Administrative Law Judges (OALJ) and, from that decision, appeal to the Benefits Review Board (BRB). Appeal from a decision of the BRB lies in the U.S. Court of Appeals for the circuit in which the injury (last exposure) arose. 33 U.S.C. § 921(c). Benefits are awarded on a finding of total disability or death due to pneumoconiosis ("black lung"), and are payable by either the responsible operator (if one can be identified) or the Black Lung Disability Trust Fund. Who pays the claim depends on a number of factors including whether a responsible operator can be identified, when the claim was filed, and the date of last exposure.

Section 932 of the Black Lung Benefits Act (30 U.S.C. § 901 et seq.) incorporates several provisions of the Longshore and Harbor Workers' Compensation Act (33 U.S.C. § 901 et seq.) including 33 U.S.C. § 928 which provides that no one who represents a claimant shall be paid a fee unless it is approved by the deputy commissioner, the board or the court before whom the work is performed. Anyone who receives an unapproved fee is subject to a fine of $1,000 or imprisonment for not

---

1. Respondent testified that he heard discussion among the plaintiff's bar that the DOL regulations might be changed to allow contingent fees and, therefore, he put the money into escrow accounts awaiting that time. Record at 235, 257–8, 269. Respondent has returned all of the fee money, with interest, to his clients.

more than one year, or both.[2] If a defendant employer declines to pay compensation within thirty days of receiving written notice of the claim, and the claimant thereafter uses the services of a lawyer to win his claim, the deputy commissioner, the board or the court awards a reasonable attorney's fee to be paid directly by the employer to the lawyer.[3] In cases where the claimant pays the attorney's fee, the DOL withholds part of the benefits when a claimant prevails until the lawyer files a fee petition that, when approved, is paid from the withheld funds.

Regulations promulgated under the Black Lung Benefits Act define the procedure and criteria for awarding attorneys' fees. 20 C.F.R. § 725.365 provides, in part:

> No fee charged for representation services rendered to a claimant with respect to any claim under this part shall be valid unless approved under this subpart. No contract or prior agreement for a fee shall be valid....

20 C.F.R. § 725.366 provides in part:

> A representative seeking a fee for services performed on behalf of a claimant shall make application therefor to the deputy commissioner, administrative law judge, or appropriate appellate tribunal, as the case may be, before whom the services were performed. The application shall be supported by a complete statement of the extent and character of the necessary work done ...

The criteria for determining fees are listed in 20 C.F.R. § 725.366(b).[4] Subsection (e) of 20 C.F.R. § 725.366 provides that a fee award by a deputy commissioner that is challenged may be reviewed by the Benefits Review Board. Because a fee is awarded only in the event a claimant is successful, lawyers are not paid at all in unsuccessful cases.

The Committee, in a Supplemental Memorandum, argues that any problems associated with black lung fee limitations are irrelevant because they did not charge Respondent with collecting an illegal fee under DR 2–106, but rather with "... *misrepresentation* to the Department of Labor regarding his intentions to collect a fee." Complainant's Supplemental Memorandum. However, this argument is not supported by the Committee's own *Full Hearing Panel Findings of Fact, Conclusions of Law and Recommendation Concerning Discipline.* In its *Conclusions of Law* at 6–7, the Committee lists the documentary evidence which establishes that Respondent knew DOL fee approval was required and, in several cases, that he authorized the DOL to release to the respective clients the portion of benefits retained to pay attorneys' fees. In these cases, Respondent also informed the DOL that he was not going to submit fee applications for their approval. The Committee says these documents

> ... are all strong evidence of the knowledge of Respondent that the way to have a fee paid for his successful representation of his Black Lung clients was to file a petition for fees as provided by Section 725.365 of the Regulations. His failure to abide by the regulation make [sic] him guilty of violation of DR 1–102(A)(4), (5) and (6) ...

It is evident, then, that the Committee found Respondent's misconduct to be his knowing violation of the DOL regulations, not his alleged misrepresentation to the DOL regarding his intentions to collect a fee. Moreover, had the Committee stated

---

**2.** 33 U.S.C. § 928(c) and (e).

**3.** 33 U.S.C. § 928(a).

**4.** The text of § 725.366(b) reads:

Any fee approved under paragraph (a) of this section shall be reasonably commensurate with the necessary work done and shall take in to account the quality of the representation, the qualifications of the representative, the complexity of the legal issues involved, the level of proceedings to which the claim was raised, the level at which the representative entered the proceedings, and any other information which may be relevant to the amount of fee requested. No fee approved shall include payment for time spent in preparation of a fee application. No fee shall be approved for work done on claims filed between December 30, 1969, and June 30, 1973, under Part B of Title IV of the Act, except for services rendered on behalf of the claimant in regard to the review of the claim under section 435 of the Act and Part 727 of this subchapter.

in its *Conclusions of Law* that Respondent lied to the DOL, such a finding would not have been supported by the record. The evidence establishes that Respondent communicated to DOL representatives that he would not submit fee applications to them in most of his cases. There is no evidence in the record that Respondent told the DOL he would not collect fees directly from his clients. In fact, the record suggests that the DOL, at least in one case, suspected the Respondent was collecting fees directly in violation of the regulations because they sent him an admonition against doing so.[5]

The gravamen of Respondent's alleged professional misconduct is not statements he made to the DOL, but his collection of fees in knowing violation of DOL regulations. The defendant argues in mitigation that the black lung attorneys' fees provisions, as they are applied, make it almost impossible for claimants to find competent counsel to represent them. Several lawyers who appeared on behalf of respondent testified about their own experiences representing black lung claimants.[6] These lawyers were, at best, not paid adequately or promptly. Some were not paid at all. This Court, then, perceived that if the allegations of respondent and his supporting witnesses that claimants cannot find counsel because of DOL fee limits were true, this case presented a significant constitutional issue. Accordingly, we invited interested parties to file additional briefs.

## II

### The Constitutional Issue

The question now before us is whether the federal limits on attorneys' fees in black lung cases violate the due process clause of the Fifth Amendment to the *Constitution of the United States* by effectively denying claimants necessary access to counsel. Answering this question raises

both factual and legal issues: the mere denial to a claimant of counsel of his choice (or for that matter, any counsel) does not necessarily imply a denial of due process rights. Fortunately, the U.S. Supreme Court has set clear, bright line standards under which we can decide the legal issues of this case in *Walters v. National Ass'n. of Radiation Survivors*, 473 U.S. 305, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985).

## III

### Due Process Analysis under Walters

■ In *Walters*, the U.S. Supreme Court upheld the constitutionality of a statute that limits to ten dollars the fee that may be paid a lawyer or agent who represents a veteran seeking benefits from the Veteran's Administration (VA).[7] In *Walters*, the plaintiff veterans argued that the fee limitation effectively precluded them from obtaining counsel and, therefore, deprived them of property without due process of law. However, in answer to this assertion, the Supreme Court pointed out that due process is a flexible concept that requires a balancing of interests; thus, there is no *absolute* right either to a trial-like hearing or to representation by counsel in every proceeding that adjudicates a property right. More specifically, the Court applied the test set out in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> ... which requires a court to consider the private interest that will be affected by the official action, the risk of an erroneous deprivation of such interest through the procedures used, the probable value of additional or substitute procedural safeguards, and the government's interest in adhering to the existing system ... In applying this test we must keep in mind, in addition to the deference owed to Congress, the fact

5. *See* State Bar exhibit 3.

6. Record at 196–198, testimony of William M. Miller stating that he has won three or four cases for claimants but has not been paid in any of them, including a case in which his client was awarded over thirty thousand dollars in back benefits in 1980; record at 206, testimony

of James F. Cain stating that he no longer accepts black lung cases due to the difficulty of getting paid.

7. The fee limitation was first enacted in 1862 during the Civil War.

that the very nature of the due process inquiry indicates that the fundamental fairness of a particular procedure does not turn on the result obtained in any individual case; rather, "procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." [citations omitted]

473 U.S. at 321, 105 S.Ct. at 3189. The Court went on to conclude that the government interest in the fee limitation in veterans' cases was to ensure:

> ... that the system for administering benefits should be managed in a sufficiently informal way that there should be no need for the employment of an attorney to obtain benefits to which a claimant was entitled, so that the claimant would receive the entirety of the award without having to divide it with a lawyer. [citations omitted]

*Id.*

In *Walters,* the Court pointed out that destruction of the fee limitation in VA cases would result not only in claimants' paying over part of their benefits to lawyers, but would also complicate a process that Congress intended to keep uncomplicated and non-adversarial. The resulting transformation of the current VA system to a complicated, adversarial one would then virtually require claimants to hire lawyers to be successful. 473 U.S. at 323–324, 105 S.Ct. at 3190–3191. The increased complexity, in turn, would require greater administrative costs, which would leave less money available for benefits. Accordingly, the Court reasoned, the government interest in the fee limitation was entitled to great weight. To prevail against such a reasonable congressional policy required an "... extraordinarily strong showing of

probability of error under the present system—and the probability that the presence of attorneys would sharply diminish that possibility ..." 473 U.S. at 326, 105 S.Ct. at 3192.

The Court frankly admitted in *Walters* that it was not possible to quantify exactly the danger of erroneous deprivation under the present system. However, the Court was quick to point out that only 16 percent of the cases that are appealed to the Board of Veterans Appeals (BVA) are reversed, which suggests a relatively low danger of erroneous deprivation if one assumes the BVA decision to be the "correct" result in every case. 473 U.S. at 327, 105 S.Ct. at 3192.

In *Walters,* the court made an important factual finding that lifting the fee limitation would not significantly reduce the danger of erroneous deprivation of veterans' benefits. For this finding the Court relied on statistics correlating the rate of ultimate success by claimants before the BVA by mode of representation. These statistics demonstrated that claimants who were represented by lawyers (*pro bono*) were only marginally more successful than *pro se* claimants or claimants represented by veterans' organizations.[8] The Court noted that various veterans' service organizations supply high quality representation for any claimant who requests it regardless of a claimant's affiliation with a veterans' organization. 473 U.S. at 311–312, 105 S.Ct. at 3184. Congress had recently considered proposals to modify the fee limitation, and a Senate Committee report in 1982,[9] stated that body's concern

> "that any changes relating to attorneys' fees be made carefully so as not to induce unnecessary retention of attorneys by VA claimants and not to disrupt unnecessarily the very effective network of

---

**8.** The following statistics were taken from the record and relied upon by the Court. 473 U.S. at 327, 105 S.Ct. at 3192.

ULTIMATE SUCCESS RATES BEFORE THE BOARD OF VETERANS APPEALS BY MODE OF REPRESENTATION

| | |
|---|---|
| American Legion | 16.2% |
| American Red Cross | 16.8% |
| Disabled American Veterans | 16.6% |
| Veterans of Foreign Wars | 16.7% |
| Other non-attorney | 15.8% |
| No representation | 15.2% |
| Attorney/Agent | 18.3% |

**9.** The proposed bill allowed limited judicial review of BVA decisions and payment of attorneys' fees for representation in that review, but the bill was never enacted. 473 U.S. at 322, note 10, 105 S.Ct. at 3190, note 10.

non-attorney resources that has evolved in the absence of significant attorney involvement in VA claims matters."

473 U.S. at 322, 105 S.Ct. at 3190.

The Court in *Walters* specifically rejected the veterans' argument that the Veterans Administration's procedures are so complex, procedurally and factually, that they require lawyer representation of claimants. Although the Court conceded that cases of agent orange or radiation exposure might be considered "complex," these cases constituted, at most, two percent of appeals to the BVA. In conformance with the principle that the fundamental fairness of a procedure depends on the risk of error inherent in the truth-finding process as applied to the generality of cases rather than the rare exceptions, the Court was not persuaded that the VA process should be changed to accommodate the "rare exception" of "complex" cases. 473 U.S. at 328–330, 105 S.Ct. at 3193–3194.

Finally, the Court examined the nature of the property interest at issue. In *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Court held that a welfare recipient subject to possible termination of benefits was entitled to a lawyer. In *Mathews v. Eldridge, supra,* the Court held that social security disability benefit recipients had no right to a pre-termination, trial-like hearing. The Court found that the benefits at stake in VA proceedings, which are not granted on the basis of need, are closer to the social security benefits in *Mathews* than they are to welfare payments "... upon which the recipients in *Goldberg* depended for their daily subsistence." 473 U.S. at 332–333, 105 S.Ct. at 3195.

## IV

### History of Black Lung Legislation

There currently exists in the State of West Virginia a large population of elderly, sick coal miners, their dependents and their survivors. Many have waited for extended periods for administrative review of their black lung claims. Others have had their claims denied, and have subsequently been unable to obtain counsel to review and prosecute their cases.

A high price is demanded of those who extract the life's blood of West Virginia's economy from the arteries in her mountains. As his lungs become clogged with insidious and pervasive dust, the miner is given a graphic projection of the quality of life that lies ahead. The nature of the disease being progressive, the miner feels himself increasingly weakened and helpless, unable to provide even the most modest means of support for his family.

The full extent of the debilitating impact of long term exposure to coal dust was recognized with the passage of Title IV of the Federal Coal Mine and Safety Act of 1969.[10] This legislation was Congress' acknowledgement of the failure of state workers' compensation programs to address the devastating effects of black lung. The original legislation covered only underground miners and their wives or widows, and allowed recovery of benefits only in cases of total disability or death. The original legislation divided claims into Part B claims—those filed before 31 December 1972, to be administered by the Secretary of Health Education and Welfare (HEW), and Part C claims—those filed after 31 December 1972. Part C claims were to be administered by the Secretary of Labor under certain provisions of the Longshoreman's and Harbor Workers' Compensation Act of 1927.[11] Payment of Part C claims was to be made by the responsible operator, or if no responsible operator could be found, from federal revenues.

In 1972, Congress passed the Black Lung Benefits Act [12] which amended the earlier legislation. In addition to extending coverage to surface miners and changing some of the eligibility criteria, the 1972 Act postponed Department of Labor jurisdiction to claims filed after 31 December 1973, established a transitional category for claims

---

**10.** Pub.L. No. 91–173, 83 Stat. 742 (1969).

**11.** 33 U.S.C. § 901 *et seq.*

**12.** Pub.L. No. 92–303, 86 Stat. 153 (1972).

filed between 1 July 1973 and 31 December 1973, and required coal companies to carry insurance or to qualify for self-insurance. The Act also allowed the Secretary of HEW to promulgate regulations to reopen all pending or denied claims and review them under the new legislation. The Secretary established a set of liberal "interim" regulations that caused a surge in Part B approvals. Part B claims were decided without any individual employer liability. *See* Lopatto, "The Federal Black Lung Program: A 1983 Primer" 85 *W. Va. L. Rev.* 677 at 686 (1983). The DOL encountered much difficulty in finding "responsible operators" to pay Part C claims due to the changing structure of the coal industry. In spite of considerable expense and effort by the government, responsible operators were being identified in only twenty-five to thirty percent of the cases. *Id.* at 689–690.

In response to the expense resulting from the surge in approvals without a corresponding increase of responsible operators to pay the claims, Congress passed the Black Lung Benefits Reform Act of 1977 [13] and the Black Lung Benefits Revenue Act of 1977.[14] These amendments established the Black Lung Disability Trust Fund to be financed by an excise tax on each ton of surface or underground mined coal. In addition, the fund was made liable for all valid Part C claims in which the miner's last covered employment ended before 1 January 1970. These 1978 amendments also contained liberal eligibility criteria that resulted in a relatively high approval rate.

Almost immediately, the Trust Fund became insolvent. The 1978 amendments also directed that all previously denied and pending cases be reviewed under the new criteria. This new review created a large backlog of cases and systemic backlog has continued. Congress amended the legislation again in 1981, raising the excise tax

and restricting eligibility criteria in an effort to make the Trust Fund solvent. The 1981 amendment has resulted in a sharply reduced approval rate for claims. DOL statistics show that for the period January 1982, through March 1988, the number of initial claims filed was 58,680, and the number of final approvals (after appeals to an Administrative Law Judge and the BRB) was 3,383—a total approval rate of 5.8 percent.[15]

## V

### *Black Lung Claims Process and Attorney Fee Provisions*

Without considering the detailed eligibility criteria and regulations promulgated under each of the amendments discussed in part V, the history of black lung legislation demonstrates that even the *filing* of a claim for benefits is complex. It often requires a lawyer to determine which benefit structure applies to a particular claim. When responsible operators are represented by lawyers of their choice, at a fee set by whatever agreement they make (there is no regulation of defense attorneys' fees), and the trust fund is represented by the Office of the Solicitor in the DOL, a claimant who appears without a lawyer is in for a baffling and frustrating experience. Black lung litigation has none of the homey, claimant-oriented ambiance that one finds in the Veterans' Administration.

Furthermore, in black lung cases the legislation and regulations specifically contemplate representation by lawyers and, unlike the VA claims process in *Walters,* for payment of attorneys' fees. For Part B claims (filed before December 31, 1972), claimants are responsible for the attorneys' fees. For claims filed after December 31, 1973, either the responsible operator (if one can

---

13. Pub.L. No. 95–239, 92 Stat. 95 (1978).

14. Pub.L. No. 95–227, 92 Stat. 11 (1978).

15. *See* Brief of Amicus Curiae, Jane Moran, DOL statistics at 4, note 5. Also, a Government Accounting Office report confirms that the Office of Workers' Compensation which makes the initial determination of claims at the adminis-

trative level in the DOL approves only about 5% of claims made under the 1981 amendments. *Delays in Processing and Adjudicating Black Lung Claims: Hearing Before the Employment and Housing Subcommittee of the House Committee on Government Operations,* 99th Cong., 1st Sess. at 55–56 (1985) (GAO Report HRD–85–19).

be identified) or the Trust Fund is liable for the attorneys' fees. But in either situation the fee must be approved under 20 C.F.R. §§ 725.365 and 755.366.

In our consideration of the constitutionality of the fee provisions, we must examine not only the words of the statute and regulations, but also the manner of their administration. In this regard we do not find that the statutory requirements assuring "reasonable" fees are unconstitutional on their face as a matter of principle; rather we find that the total regulatory scheme is unconstitutionally applied. As the U.S. Supreme Court stated in overturning a state compulsory work statute in *U.S. v. Reynolds*, 235 U.S. 133, 35 S.Ct. 86, 59 L.Ed. 162 (1914):

> If such state statutes, upon their face, *or in the manner of their administration,* have the effect to deny rights secured by the Federal Constitution or to nullify statutes passed in pursuance thereto, they must fail. [citations omitted, emphasis supplied]

235 U.S. at 149, 35 S.Ct. at 90. In *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) the U.S. Supreme Court held unconstitutional a state law which, in effect, required a transcript to perfect a criminal appeal but did not provide a free transcript to indigents. The Court pointed out that:

> Dissenting opinions here argue that the Illinois Law should be upheld since by its terms it applies to rich and poor alike. But a law nondiscriminatory on its face may be grossly discriminatory in its operation.

351 U.S. at 17, note 11, 76 S.Ct. at 590, note 11.

As we explained above, 20 C.F.R. § 725.366(a) provides that the claimant's lawyer should file a fee application with the deputy commissioner, the administrative law judge or the Benefits Review Board for the services performed before that individual or tribunal. The fee is then to be deter-

mined from the information provided in the application and in accordance with the criteria provided in 20 C.F.R. § 725.366(b). In addition, the Benefits Review Board has ruled that the contingent nature (i.e., risk of loss) of the litigation may be included as a criterion under the provision in part (b) that allows consideration of "any other information which may be relevant to the amount of fee requested." *Risden v. Director*, BRB No. 78–488, 11 BRBS 819 (1980).

Although 20 C.F.R. § 726.366(b) appears to provide for attorneys' fees that will fairly compensate competent counsel, thus guaranteeing claimants' due process rights, an examination of the factual record before us reveals that this is not the case. Numerous attorney affidavits filed in this case as well as testimony before the House of Representatives Subcommittee on Labor Standards establishes that the attorney fees policy of the DOL discourages lawyers from representing black lung claimants so that many claimants, with cases of at least arguable merit, are unable to find counsel to represent them.

## VI

### *Actual Implementation of the DOL's Attorneys' Fee System*

The DOL will not award any attorneys' fee until a "final" decision has been made in a case. *See* 33 U.S.C. § 928(a) and *Thompson v. Potashnick*, 812 F.2d 574 (9th Cir.1987). Although a claimant may prevail before the Deputy Commissioner and Administrative Law Judge (assuming an appeal is taken at each stage) and his attorney files a fee petition that is approved at each stage, the fee will not be paid until after a final decision by the Benefits Review Board (BRB). If the BRB remands the case to the Administrative Law Judge, the attorney must wait even longer for his fee. The record reveals that lawyers wait for years, often five to ten years, before receiving any payment.[16]

---

**16.** A report by the Government Accounting Office, relying on DOL statistics, states that 78% of cases disposed of by the Office of Administrative Law Judges between October 1, 1983, and

August 21, 1984 took more than two years to adjudicate. When time is added for the initial administrative determination as well as an appeal to the BRB, it is clear that it does, indeed,

There is no provision in the law for payment of interest on attorneys' fees.[17] One affiant attorney states that he is currently owed more than $30,000 in fees that have been awarded but not paid. Brief of Amicus Curiae Jane Moran, affidavit of Robert F. Cohen, Jr. at 7. In a small, depressed West Virginia town $30,000 is a substantial amount of money for an individual practitioner. In the long run, as John Maynard Keynes once observed, we are all dead. In the short run, lawyers have offices to run, mortgages to pay and children to educate.

Another affiant attorney states that the DOL has an informal policy [18] of allowing a maximum hourly rate of $85.00 for proceedings before the Deputy Commissioner, and a maximum hourly rate of $125.00 for proceedings before the Office of Administrative Law Judges or BRB. *Id.*, affidavit of Frederick Muth at 3. This same affiant states that a typical case will average between two and eight years, depending on the length of appellate litigation, and that because of this factor and the low rate of compensation (in light of its contingent nature), fewer qualified attorneys are accepting black lung claims than are required to process existing meritorious claims. He also points out that "... it has become increasingly common to find instances of U.S. Department of Labor hearing dockets populated primarily with *pro se* claimants ..." and that his law firm has been inundated with prospective clients who have been unsuccessful in their efforts to retain competent representation. *Id.* at 4.

Another affiant attorney, employed for five years by the United Mine Workers of America, who has handled black lung cases during all five years, and worked exclusively on black lung cases for two years, states that few attorneys are willing to represent black lung claimants due to the risk of no recovery (and, therefore, no fee). This affiant also points out that because a lawyer generally accepts the case before either parties' medical evidence is complete, the lawyer is usually unable to assess the merits of a black lung claim until after he agrees to represent the claimant. Furthermore, it is nearly impossible to handle a few cases on a *pro bono* basis because the complexity of black lung litigation requires a level of expertise that is consistent only with a large number of cases due to the enormous investment of time necessary to learn the law and keep current with changes.[19]

In 1985, the House Subcommittee on Labor Standards [20] held several hearings in coal regions to study the problem of the systemic backlog of black lung cases. Two lawyers who testified before the Subcommittee in Wise, Virginia, who have been representing black lung claimants since the first law was enacted, provided ten specific examples where fees were approved, but no payment was received for at least two years, and in some cases, for five years or more.[21] Another lawyer testified that there are 26 cases in his office in which fees were awarded but not paid for more

take years to resolve a claim. *Delays in Processing and Adjudicating Black Lung Claims: Hearing Before the Employment and Housing Subcommittee of the House Committee on Government Operations*, 99th Cong., 1st Sess. at 41 (1985) (GAO Report HRD–85–19).

**17.** Although the DOL seems cavalier about the fact that lawyers must wait for years to collect fees without also receiving interest on the fees, we note that the Internal Revenue Service is Rhadamanthine in its collection of interest when the U.S. government is a payee rather than a payor. In addition to any penalty that might be properly assessed, the IRS collects interest on any overdue or unpaid taxes, even if the taxpayer has been granted an extension of time in which to pay. *See* 26 U.S.C. § 6601, 26 CFR § 301.6601–1 *et seq.* We also note that a

responsible operator must pay interest if it fails to pay benefits awarded either initially by the deputy commissioner, or on appeal. 30 U.S.C. § 934, 20 CFR § 725.608.

**18.** The DOL does not have a formal policy establishing a maximum hourly rate. *Ashmore v. Director*, BRB No. 79–639, 3 BLR 1–374 (1981).

**19.** *See* Appendix A.

**20.** Subcommittee of the House Committee on Education and Labor.

**21.** *Investigation of the Backlog in Black Lung cases: Hearings before the Subcomm. on Labor Relations of the House Comm. on Education and Labor*, 99th Cong., 1st Sess. 82–83 and 88–89 (1985).

than three years.[22] Even if we assume that these examples are "exceptional" in some way, the very existence of "exceptional" cases in which lawyers are required to subsidize the operation of the federal government must have a chilling effect on lawyer willingness to enter the system.

Finally, one lawyer testified that many of his colleagues had "... stated unequivocally that they would not take black lung cases because of the delay in receiving the pay for their work as well as the possibility that they may receive no fee at all." [23] Virtually all of the lawyers who testified before this subcommittee stated that they rarely, if ever, took black lung cases due to the long delay before a decision, the additional delay in having fees paid, and the uncompensated risk of receiving no payment, particularly in light of the significantly lower approval rate under the 1981 eligibility rules.

It is hardly surprising then, that most lawyers, at least most who have any choice, choose to handle cases that do not require a five year delay for fee payment. The two factors that currently keep most attorneys from accepting black lung cases are the long delay in payment, without any provision for interest, and the lack of premiums to offset the contingent nature of the work. This latter factor has become increasingly prominent as the approval rate has steadily declined following the enactment of the 1981 amendments. DOL statistics demonstrate an approval rate for claims decided under the 1981 law of 22.7% for claimants before the Administrative Law Judges, and an overall approval rate of 5.8%.[24] This approval rate is significantly smaller than that for VA claims,[25] and demonstrates not only the necessity of lawyer representation, but the substantial risk that a lawyer will receive no fee at all for his work.

## VII

### Application of Walters Criteria to Black Lung Litigation

When the criteria set forth by the U.S. Supreme Court in *Walters* to assess the constitutionality of fee limitations are applied to black lung cases, it becomes apparent that the Fifth Amendment's due process clause requires that the provisions for awarding attorneys' fees in black lung cases must, in fact, allow claimants representation by competent counsel.

When the Court in *Walters* examined the nature of the government interest in limiting fees in veterans' cases, it found that the purpose of the limitation was to avoid lawyers' needlessly sharing claimants' benefits. The Court found that VA procedures are designed to be non-adversarial, and that if lawyers become involved on a large scale a more complicated and adversarial process will evolve without any improvement in terms of rates of error over the current system. However, in black lung litigation, it is clear that Congress intended that lawyers be used by claimants because it specifically provides for lawyers, and for payment of a "reasonable" attorney's fee. 33 U.S.C. § 928. And although the VA benefits process is relatively simple and non-adversarial, the black lung process is both complex and adversarial.[26]

The government interest in requiring approval of attorneys' fees in black lung cases is to ensure that neither the responsible operator nor the Trust Fund will be overcharged. The prohibition against direct agreement between a claimant and his lawyer is to protect claimants from improvident agreements that needlessly deplete their benefits. *See Moore v. Califano*, 471 F.Supp. 146 at 149 (1979). Unfortunately, the result of these regulations has been to make lawyers almost entirely unavailable to claimants. Indeed, although the ordinary claimant is not called upon to share

22. *Id.* at 194.

23. *Id.* at 188.

24. *See supra*, note 15.

25. Of 800,000 VA claims in 1978, more than 400,000 were allowed at the initial level and approximately 14,400 more were allowed after appeals. *Walters*, 473 U.S. at 309, 105 S.Ct. at 3183.

26. See discussion, *supra*, at Sections IV and V.

his award with a lawyer, under the current system the claimant seldom has an award to share.

This turns our attention, then, to the second factor the Court analyzed in *Walters*, namely, the risk of erroneous deprivation of benefits under the existing VA procedure, and the probable value of additional or substitute safeguards. Relying on the statistics before it in *Walters (supra*, note 8), which demonstrated that claimants with lawyers are only marginally more successful in VA cases than claimants without lawyers, the Court found that allowing claimants free access to lawyers would not significantly increase the number of prevailing claimants. Factually, this is decidedly not the situation in black lung cases.

The black lung claims process is procedurally, factually and legally complex. Furthermore, at least in cases where a responsible operator is potentially liable for benefits, it is viciously adversarial.[27] Unfortunately, we do not have before us the kind of statistical evidence that the Court had in *Walters*. However, the Respondent's clients can probably be taken as representative of most claimants; they were all refused benefits before they retained Respondent who then won their cases.[28] Ironically, a responsible operator is free to retain lawyers to resist claims. Because benefits are expensive, operators often oppose claims vigorously.[29] In cases where the award will be paid by the Trust Fund, the Fund is represented by lawyers from the DOL Office of the Solicitor. Finally, although the veterans' service organizations provide knowledgeable representatives to aid claimants for VA benefits, a fact that greatly impressed the Court in *Walters*, no such system of alternative representation exists to aid black lung claimants.[30] Therefore, lawyer representation is virtually essential to prevent erroneous deprivations of benefits for victims of black lung.

The third and final factor considered by the Court in *Walters* was the nature of the private interest at stake. The Court found that VA benefits are more akin to the social security benefits considered in *Mathews* than they are to the welfare benefits considered in *Goldberg*.[31] Because black

27. Although the Office of Workers' Compensation in the Department of Labor (which is responsible for the initial decision of black lung claims) approves only about 5% of claims filed, responsible operators appeal more than 90% of these approvals to the Office of Administrative Law Judges. Of the 95% of the claims denied, applicants appeal about 40% to the OALJ. *Delays in Processing and Adjudicating Black Lung Claims: Hearing Before the Employment and Housing Subcommittee of the House Committee on Government Operations*, 99th Cong., 1st Sess. at 55–56 (1985) (GAO Report HRD–85–19).

28. Record at 34, 66–70, 82–83, 95, 111, 138–9, and 152.

29. Brief of Amicus Curiae, Jane Moran, affidavit of Robert Cohen at 8–9, affidavit of Frederick Muth at 5–6. "The actuarial value of a 1982 claim by a living miner with a spouse is nearly $150,000 dollars." Lopatto, "The Federal Black Lung Program: A 1983 Primer," 85 *W.Va.L.Rev.* 677 (1983) at 686, citing actuarial chart in Black Lung Benefits Act Annual Report, U.S. Department of Labor 33 (Jan.1981).

30. Although the United Mine Workers of America (UMWA) has provided substantial representation for claimants in the past, District 31 of the UMWA, one of three districts serving West Virginia, has ceased such representation due to lack of money. Brief of Amicus Curiae, Jane

Moran, attached letter of January 26, 1987 from Eugene Claypole, John Darcus and James Slusser of UMWA.

31. The District Court in the *Walters* case held that applicants for benefits, no less than persons already receiving them, have a "property" interest if the applicants meet the statutory criteria for benefits. The Supreme Court has thus far held only that a recipient of benefits has a "property" interest in their continued receipt. Since at least one of the claimants in *Walters* alleged a diminution of benefits already being received, the Court did not decide whether a mere claimant has a "property" interest in his prospective benefits. 473 U.S. at 320, note 8, 105 S.Ct. at 3189, note 8. Respondent Triplett represented one claimant from whom the government sought repayment of an alleged overpayment of benefits. Record at 100–102. Because this client clearly had a vested property interest in these benefits, we need not rule on the nature of a claimant's property interest in prospective benefits, a question the Supreme Court has so far deferred. However, we here state our belief that a claimant who meets all the criteria making him eligible for benefits should not be deprived of due process safeguards simply because he is not already receiving benefits. Black lung benefits are not a form of government largesse, but rather are *compen-*

lung benefits are awarded only in cases of total disability or death,[32] they may well provide the only means of subsistence. This makes them similar to the welfare benefits "... upon which the recipients in *Goldberg* depended for their daily subsistence." *Walters*, 473 U.S. at 332–333, 105 S.Ct. at 3195.

Accordingly, we find that the DOL system of awarding attorneys' fees does, in fact, severely restrict claimants' ability to find competent lawyers to represent them, and, therefore, the system violates due process in accordance with the decision of the U.S. Supreme Court in *Walters*.

Alternatively, there is an independent basis for finding a violation of due process in a fee limitation scheme that effectively denies claimants the right to benefits granted by Congress. It is fundamentally unfair for the government to confer a right with one hand, and take it away with the other hand. As Chief Justice John Marshall said in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803):

> "In all other cases," he says, "it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is awarded." [quoting Blackstone] ...
>
> The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.

5 U.S. (1 Cranch) at 163.

Congress has conferred upon qualified claimants the right to receive black lung benefits. Congress has also prescribed the remedy (the claims process) to guarantee this right, an essential part of which is the right to counsel. It is, therefore, unconstitutional for the Department of Labor by its regulations to deny qualified claimants the procedural safeguards provided by Congress that are essential to vindicate the right to benefits also granted by Congress.

## VIII

### *The Risk of Loss Problem*

There are several possible ways to award attorneys' fees that take into account the risk of loss factor in black lung cases. Most directly, the law could provide for a contingent fee based on a set percentage of any lump sum awarded, as the Respondent contracted for in this case. In the alternative, a multiplier could be used to enhance the "normal" hourly fee to compensate for the risk of loss. The U.S. Supreme Court has recently examined the use of "contingency multipliers" in the context of fee-shifting statutes.

In *Pennsylvania v. Delaware Valley Citizens Council*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), the Court reversed a U.S. District Court's use of a contingency multiplier to enhance an award of attorneys' fees to successful plaintiffs under the fee-shifting provisions of the Clean Air Act (42 U.S.C.S. § 7604(d)). Justice White, writing for a plurality, said "The issue before us is whether, when a plaintiff prevails, its attorney should or may be awarded separate compensation for assuming the risk of not being paid." 483 U.S. at 715, 107 S.Ct. at 3081. Although Justice O'Connor joined the plurality to make a majority, she limited her concurrence to the circumstances of the particular case because she concluded that Congress "... did not intend to foreclose consideration of contingency in setting a reasonable fee under fee-shifting provisions such as the Clean Air Act ..." *Id.* 107 S.Ct. at 3089.

---

*sation* for which the miner has paid dearly, either with total disability or death. If due process is truly a flexible concept, as the U.S. Supreme Court has repeatedly held, there can be no justification for an inflexible rule that claimants have no property interest in benefits for which they *qualify* but which they do not yet receive.

**32.** The statute has one exception that allows payment of benefits to eligible survivors of a miner who dies before March 1, 1978, and who was employed at least 25 years in coal mines prior to June 30, 1971, unless it is established that when the miner died, he was not *partially* or totally disabled due to black lung. 30 U.S.C. § 921(c)(5) (1981).

In addition to the mathematical difficulty of computing contingency multipliers, the Court pointed out that one of the strongest objections to them is that "... it penalizes the defendant with the strongest defense, and forces him to subsidize the plaintiff's attorney for bringing other unsuccessful actions against other defendants." *Id.* at 3085, citing Leubsdorf, "The Contingency Factor in Attorney Fee Awards," 90 *Yale L.J.* 473 at 488–491. The Court also noted that a contingency multiplier might encourage risky litigation because the less chance there is of prevailing, the higher the multiplier. *Id.* at 3086. However, Justice O'Connor, as well as the four dissenting Justices,[33] argued that this reasoning correctly suggests that awarding contingency enhancement based on the merits of a particular case may be undesirable, but the fact that it may be undesirable in a particular case does not, as a matter of principle, undercut the substantial justification for contingency enhancement in some types of cases. *Id.* at 3097 (Blackman, J., dissenting).

The Court held that enhancement of a fee for the risk of loss in fee-shifting cases should be made only in exceptional cases when the risk of no recovery is clear from the outset of a case and when, without risk-enhancement, plaintiff "... would have faced substantial difficulties in finding counsel in the local or other relevant market." *Id.* at 3089. The Court concluded that these elements were not present in the case before it and held that the District Court's use of a multiplier in that case was improper.

The Court's decision in *Delaware Valley* does not preclude the use of a contingency multiplier in black lung cases. *Delaware Valley* applies to cases involving fee-shifting statutes that are different from the attorney fee provisions in black lung cases. Most importantly, fee-shifting statutes do not affect the ability of plaintiffs to enter into whatever contracts they desire with their lawyers and thus increase the lawyer's ultimate fee beyond the amount awarded under a fee-shifting statute. In black lung cases, however, no contract between a claimant and his lawyer is allowed, so lawyers are forced to accept the risk of receiving no fee at all in the large majority of cases.

Furthermore, in black lung cases, when either the claimant or the Trust Fund must pay attorneys' fees, there is no danger of losing defendants' compensating plaintiffs' lawyers for not prevailing against other defendants in other cases—the factor that so disturbed the Court in *Delaware Valley*. Also, it is clear from the evidence before us that the administration of the black lung attorneys' fee provisions has, in fact, caused claimants to face substantial difficulties in finding counsel willing to represent them, a factor specifically required by the Court in *Delaware Valley* for enhancement of fees in fee-shifting cases. *Id.*

## IX

It is clear from the evidence before us that most lawyers are unwilling to represent black lung claimants because of the inadequate fees awarded by the DOL. On the one hand, it takes a matter of years to litigate a case, and often an additional two years after a successful conclusion for a lawyer to be paid his fee. When there is no provision for interest, and a lawyer faces overhead costs that cannot be postponed, any lawyer will turn his attention to paying cases. In addition, because there is no systematic enhancement of fees to compensate lawyers for the risk of loss—a very substantial risk in cases decided under the 1981 law—most lawyers who have a choice will prefer contingent fee cases that provide premiums for risk.

We do not suggest what would be the best system for awarding attorneys' fees in black lung cases. That decision is properly left to Congress and the DOL promulgating regulations pursuant to congressional legislation within the bounds set by the *Constitution.* We do, however, find that the system as currently administered denies claimants for black lung benefits property without due process of law by severely

---

**33.** Justices Blackman, Brennan, Marshall and Stevens.

restricting their right to obtain representation by competent counsel in the highly adversarial process of black lung litigation.

The respondent, George Triplett, was forced into making a tragic choice between conflicting duties. He either had to refuse to represent deserving, disabled miners, run the risk of bankrupting his practice, or violate the DOL regulations. The U.S. Supreme Court stated in *Ex Parte Siebold*, 100 U.S. 371, 25 L.Ed. 717 (1879) that:

An unconstitutional law is void, and is as no law. An offence created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment.

100 U.S. at 376–377. *Accord, Norton v. Shelby County*, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1885); 16 Am.Jur.2d § 256.[34]

Six black lung clients of Respondent testified at the ethics hearing before the Committee. One client was dissatisfied and said that he never agreed to pay Mr. Triplett anything for his work, although the client testified that the signature of his name on a 25 percent contingent fee contract did appear to be his. Record at 31. The Respondent testified that he explained the fee agreement fully to this client (and all of his other clients) before the client signed it. Record at 144. The other five clients testified that they agreed to pay Mr. Triplett 25 percent of any past benefits they were awarded, and that they were satisfied with Mr. Triplett's work and felt he deserved to be paid the 25 percent fee. The Respondent put the fee money he received into interest-bearing escrow accounts in the vain hope that the regulations would be changed to allow contingent fee agreements. We do not believe that this constitutes clear evidence of professional misconduct by Respondent.

The Committee on Legal Ethics has the burden to prove by full, preponderating and clear evidence that Respondent is guilty of professional misconduct under DR 1–102(A)(4), (5) and (6) of the West Virginia *Code of Professional Responsibility*. Accordingly, we find the Respondent, George Triplett, not guilty of any ethical violation for resisting an administrative system that clearly and unambiguously violates the Fifth Amendment to the *Constitution of the United States*.

Because our decision involves an important question of federal law, we grant leave to the Department of Labor to intervene as a party litigant, either for the purpose of filing a petition for rehearing before this Court, or for the purpose of prosecuting an appeal to the Supreme Court of the United States.

Attorney Exonerated.

## APPENDIX A

### AFFIDAVIT SUPPLIED BY AMICUS, JANE MORAN

I, THOMAS H. ZERBE, being first duly sworn, state as follows:

I am an attorney employed with District 17, United Mine Workers of America in

---

**34.** Generally we do not believe it is sound practice to cite Am.Jur. because the treatise often states the majority and minority positions on a given issue with equal force. However, we deviate from our general rule here because with regard to the effect of unconstitutional laws, it appears that the weight of authority for the proposition quoted is so overwhelming that there is no minority position.

16 Am.Jur.2d § 256, in relevant part, reads:
The general rule is that an unconstitutional statute, whether federal or state, though having the form and name of law, is in reality no law, but is wholly void, and ineffective for any purpose; since unconstitutionality dates from the time of its enactment, and not merely from the date of the decision so branding it, an unconstitutional law, in legal contemplation, is as inoperative as if it had never been passed. Such a statute leaves the question that it purports to settle just as it would be had the statute not been enacted. No repeal of such an enactment is necessary.

Since an unconstitutional law is void, the general principles follow that it imposes no duties, confers no rights, creates no office, bestows no power or authority on anyone, affords no protection, and justifies no acts performed under it. A contract which rests on an unconstitutional statute creates no obligation to be impaired by subsequent legislation.

No one is bound to obey an unconstitutional law and no courts are bound to enforce it. Persons convicted and fined under a statute subsequently held unconstitutional may recover the fines paid. [Footnotes omitted]

Charleston, West Virginia. I have been employed by District 17, U.M.W.A. for five (5) years. During all my five year tenure, I have either handled federal black lung claims or supervised attorneys who handled federal black lung claims. For two (2) years, my work was almost exclusively handling federal black claims. Currently, I am Director of Benefits, and as part of that job I supervise the black lung attorney as well as handle some claims myself.

I am familiar with virtually every attorney in West Virginia who represents clients in federal black cases. I have spoken personally with many of these attorneys about the economics of handling federal black lung cases. I have also spoken with clients and administrative law judges about the problem of claimants, who are not members of the United Mine Workers of America, in getting attorneys to represent them in federal black claims.

The number of attorneys willing to accept federal black lung claims has always been limited, but it has declined even more in recent years. Of those attorneys who do not accept federal black lung cases, many have a policy of accepting them only as a service to clients, whom they represent on other matters.

The reason attorneys are unwilling to represent claimants in federal black lung claims is simple economics. The cases are difficult to win and the fee awards are too low considering the contingent nature of a fee. The federal statute prohibits the attorney from charging the client. If the attorney wins the case, he submits a fee petition based on the number of hours that he has in the claim to the administrative law judge, who awards attorney's fees against the defendant. Most of the administrative law judges award an hourly rate that would be generous were it not a contingent fee, but it is still not enough considering the contingent nature of the fee and the very low win rate. The win rate for claimants before the Department of Labor administrative law judge deciding claims filed after January 1, 1982, under the post-amendment law is only 22.7 percent.

Since the attorney generally accepts the case before either parties' medical evidence is fully developed, the attorney is often unable to evaluate the merits of the case at the time he accepts the client. This compounds the attorney's risk. It is impossible for attorneys to handle only a few cases *pro bono* because it is necessary to handle a substantial number of cases in order to justify the time the attorney needs to invest to learn and keep current in this complex law.

By prohibiting attorneys from taking a percentage of the back award, the statute was designed to protect coal miners and their widows from gouging attorneys. Unfortunately, the effect has been to make lawyers unavailable to the miners and widows whom the law was designed to protect. The only way the system will work is to drastically increase the fee awards. [Signature and acknowledgements omitted]

## ON REHEARING

On a former day, to-wit the 14th day of December 1988, came the United States Department of Labor by its Solicitor of Labor, George R. Salem, Esq., and pursuant to leave heretofore granted, intervened to petition the court to grant a rehearing in this matter. Intervenor, the United States Department of Labor, also petitioned to supplement the record by the inclusion of the following: Affidavit of James L. De Marce, Associate Director, Division of Coal Mine Workers' Compensation; Affidavit of Jane G. Denney; Affidavit of Nahum Litt; Department of Labor Letters CM–1000a and CM–1000b; and the awards and/or decisions in the cases of Charles Ice, Raymond Corley, Thelma Beam, Jacob B. Godwin, Peter Guire, Anna J. Poling, Euna Ball, Harry Hedrick, William F. Scott, and Inobelle Stevenson. All of the aforesaid material is hereby ordered filed and made a part of the record in this case for all purposes.

The court has carefully considered the supplemental material filed by the Department of Labor in support of its petition for rehearing, and has also carefully considered the factual representations and

legal arguments set forth in intervenor's brief in support of its petition for rehearing. The court concludes that the arguments advanced by the Department of Labor were maturely considered upon the initial submission of this case and are adequately addressed in the court's original opinion.

Intervenor seeks to overcome the court's conclusion that lawyers are paid inadequately and *too slowly* under the current Department of Labor fee limitation system through the following representation:

"Nor is it reasonable to conclude from the record that respondent would have experienced inordinate delays in having his fee petitions approved. In the one instance where he submitted a fee petition after obtaining a Trust Fund award at the deputy commissioner level, he received payment, at the requested rate and for more hours than he documented (but less than he requested), approximately eight months after his application ... In the one instance where he applied to an ALJ for a fee award in a responsible operator case, he received an award, despite the operator's objections, within 11 months of the date of his application, and within 7 months of the ALJ's receipt of it."

Intervenor's Brief at p. 7. We find that an eight month and eleven month delay in fee payments simply support the findings of fact and conclusions of law set forth in the court's original opinion.

Intervenor defends the constitutionality of the fee system as applied by arguing that a different system would be more expensive *both* in terms of the cost of lawyers' fees and in terms of the added burden on the system of affording claimants a fair opportunity to be heard. In this regard intervenor asserts:

"Another legitimate government interest is to ensure that responsible operators and the Trust Fund will not be overcharged. The Court recognized (slip op. 23) but gave very little weight to this interest. This interest is substantial because of operators' constitutional rights (*Levins* [*v. Benefits Review Bd.*], 724

F.2d [4] at 9) and because the Trust Fund, which is financed by the coal industry (26 U.S.C. ( & Supp. IV) 4121(a), 9501), is currently almost $3 billion in debt to the United States Treasury. See Affidavit of James L. De Marce, *supra*. Higher attorney's fees could increase this debt, as could the expense of more prolonged claims processing from attorney participation in cases (cf. *Walters*, 473 U.S. at 324–326 [105 S.Ct. at 3191–3192]), the latter by requiring the hiring of more personnel at the ALJ and Benefits Review Board levels to prevent a rebuilding of a case backlog ... Such increased costs to the Fund, and thereby to the government in the form of increased debt, must be given serious consideration, as the Court admonished in *Mathews*, 424 U.S. at 348 [96 S.Ct. at 909] even though they are not controlling. At some point, the costs to government and the public (including the resulting need to cut limited resources elsewhere) outweigh the benefit to the individual of the additional safeguard."

Intervenor's brief at pp. 16, 17. We infer that the Solicitor is arguing that the current fee limitation system, which discourages adequate representation, is justified on the grounds that if claimants had access to lawyers, claimants would prevail more often and raise the costs of the black lung program. We do not find that Congress's purpose in authorizing limitations on fees was to reduce the number of eligible claimants who would prevail and receive benefits.

Intervenor makes explicit reference to statistics compiled specially for its rehearing petition in this case. The Department of Labor's own specially compiled statistics (the Solicitor's best shot) conclusively demonstrate that at the administrative law judge level, claimants represented by counsel have a likelihood of prevailing that is 2.5 times greater than claimants appearing *pro se*. In this regard the Solicitor says:

"Statistics compiled by the Department in a sample of recent cases resulting in awards or denials of benefits show that claimants are represented at the ALJ level in 92% of the cases, and prevail 29%

of the time when represented. While the statistics also show that the small minority of *pro se* claimants have an 11.6% success rate, this difference certainly is not so significant as to establish that lawyers are indispensable in the BLBA claims process—particularly in light of the 92% representation rate."

Intervenor's brief at p. 23. We find that the Solicitor has simply reinforced with more elaborate statistics the conclusion that we reached in the original opinion—namely, that a claimant's chance of prevailing when he is represented by counsel is substantially higher than when he appears *pro se.*

When claimants represented by counsel prevail 2.5 times as frequently *pro se* claimants, we cannot agree with the Solicitor that the difference is not constitutionally significant for due process purposes. The Solicitor argues that:

> "Assuming, without conceding, that applicants have a property interest under the due process clause, their interest is only the intangible interest in receiving fair consideration of their applications. They risk losing only a chance at benefits rather than the benefits themselves."

Intervenor's brief at p. 19. However, we stand by our original conclusions: We believe that "receiving fair consideration" is exactly the type of abstract entitlement that due process principles are designed to protect and enhance.

Finally, we have carefully considered the following argument of the Solicitor:

> "Moreover, as in *Walters,* 473 U.S. at 326 [105 S.Ct. at 3193] there is also a risk that increased attorney representation may exacerbate the adversarial nature of the black lung adjudicatory system, resulting in an [sic] increased administrative costs to the government and delay to deserving claimants."

Intervenor's brief at p. 23. Because responsible operators may be as adversarial as they wish in the defense of claims, and may spend as much money as they choose on lawyers' fees, we have a hard time understanding how claimant representation by lawyers is liable to "exacerbate the ad-versarial nature of the black lung adjudicatory system...." Although we know the irony is unintentional, we cannot help but infer that the Solicitor is arguing that if claimants have full and fair access to lawyers, they might do reprehensibly adversarial things such as introduce competent evidence, study the claims regulations, vigorously prosecute cases, and perhaps even appeal to the courts.

Accordingly, it is Adjudged, Ordered and Decreed that Intervenor's petition for rehearing be, and the same hereby is denied. And it is further Ordered that this Order be printed as an addendum to the original opinion.

MILLER, Justice, dissenting:

We have traditionally stated that the scope of appellate review is confined to those issues decided at the trial level except where the lower court lacked jurisdiction to act in the first instance. This has coalesced into the language reflected in Syllabus Point 2 of *Duquesne Light Co. v. State Tax Dep't,* 174 W.Va. 506, 327 S.E.2d 683 (1984): " 'This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance.' Syllabus Point 2, *Sands v. Security Trust Co.,* 143 W.Va. 522, 102 S.E.2d 733 (1958)."

Here the question of the constitutionality of the black lung fee statute could have been raised below, but it was not. Because the issue was not raised below, there is no factual record developed. The ex parte affidavits filed as attachments to the amicus brief of Jane Moran are, to my mind, woefully inadequate to predicate the factual conclusion reached by the majority.

Furthermore, the majority's reliance on *Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985), is completely misplaced. I find, contrary to the majority's statement, at 85, that *Walters* does *not* set "clear, bright line standards." What *Walters* did was to uphold the ten dollar fee statutorily authorized for a lawyer or agent who represented a veteran who was seeking veteran's benefits. It did so chiefly because it

began with this fundamental legal proposition:

> "Judging the constitutionality of an Act of Congress is properly considered ' "the gravest and most delicate duty that this Court is called upon to perform." ' *Rostker v. Goldberg,* 453 U.S. 57, 64 [69 L.Ed.2d 478, 486, 101 S.Ct. 2646, 2651 (1981) ] (quoting *Blodgett v. Holden,* 275 U.S. 142, 148, 276 U.S. 594, 72 L.Ed. 206, 48 S.Ct. 105 (1927) (Holmes, J.)), and we begin our analysis here with no less deference than we customarily must pay to the duly enacted and carefully considered decision of a coequal and representative branch of our Government." 473 U.S. at 319, 105 S.Ct. at 3188, 87 L.Ed.2d at 232.

The Supreme Court's bottom line in *Walters* was that there was no factual showing that the fee system deprived veterans of due process under *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> "We accordingly conclude that under the *Mathews v. Eldridge* analysis great weight must be accorded to the Government interest at stake here. The flexibility of our approach in due process cases is intended in part to allow room for other forms of dispute resolution; with respect to the individual interests at stake here, legislatures are to be allowed considerable leeway to formulate such processes without being forced to conform to a rigid constitutional code of procedural necessities. *See Parham v. J.R.,* 442 U.S. [584], at 608, n. 16, 61 L.Ed.2d 101, 99 S.Ct. 2493 [2507, n. 16

(1979) ]. It would take an extraordinarily strong showing of probability of error under the present system—and the probability that the presence of attorneys would sharply diminish that possibility—to warrant a holding that the fee limitation denies claimants due process of law. We have no hesitation in deciding that no such showing was made out on the record before the District Court." 473 U.S. at 326, 105 S.Ct. at 3192, 87 L.Ed.2d at 236.[1]

In this case, I simply do not believe that such an "extraordinarily strong showing" has been made based on the generalized ex parte affidavits filed with this Court.[2] Here the main complaint by the several affiants is not so much the amount of the fee received, but the delay in receiving fees because of the backlog of black lung cases. I know of no court which has seized on this fact to void a fee system.

Finally, there appears to me to be a lamentable lack of due process extended to the Department of Labor, which now finds its attorney's fee mechanism declared unconstitutional without ever having the opportunity to be heard before this Court announced its decision.

I am authorized to state that Justice McHUGH joins me in this dissent.

---

**1.** *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33, formulated this set of factors to determine the appropriate due process requirements:

> "[F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

**2.** In *Walters,* the Supreme Court was confronted with similar generalized assertions about the

unfairness of the administrative procedures in the Veteran's Administration and made this telling comment:

> "Anecdotal evidence such as this may well be sufficient to support a finding by a judge or jury in litigation between private parties that a particular fact did or did not exist. But when we deal with a massive benefits program provided by Congress in which 800,000 claims per year are decided by 58 regional offices, and 36,000 claims are appealed to the BVA, it is simply not the sort of evidence that will permit a conclusion that the entire system is operated contrary to its governing regulations." 473 U.S. at 324 n. 11, 105 at S.Ct. at 3191 n. 11, 87 L.Ed.2d at 235 n. 11.