UNITED STATES DEPARTMENT OF LABOR *v.*
TRIPLETT ET AL.

No. 88–1671.   Argued January 16, 1990—Decided March 27, 1990*

---

*Together with No. 88–1688, *Committee on Legal Ethics of the West Virginia State Bar* v. *Triplett et al.,* also on certiorari to the same court.

SCALIA, J., delivered the opinion of the Court, in Parts I, II–A, III, and IV of which REHNQUIST, C. J., and WHITE, BLACKMUN, STEVENS, O'CON-NOR, and KENNEDY, JJ., joined, and in Part II–B of which REHNQUIST, C. J., and STEVENS, O'CONNOR, and KENNEDY, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 727. MARSHALL, J., filed an opinion concurring in the judgment, in Part II of which BRENNAN, J., joined, *post*, p. 728. BRENNAN, J., filed a separate statement, *post*, p. 736.

*Michael R. Dreeben* argued the cause for petitioners in both cases. With him on the briefs for petitioner in No. 88–1671 and respondent in No. 88–1688, under this Court's Rule 12.4, were *Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Roberts, William Kanter, John S. Koppel, Allen H. Feldman,* and *Edward D. Sieger. Jack Marden* filed a brief for petitioner in No. 88–1688 and respondent in No. 88–1671, under this Court's Rule 12.4.

*Jane Moran* argued the cause for respondent Triplett in both cases. On the brief was *James A. McKowen.*†

---

†Briefs of *amici curiae* urging affirmance were filed for the Association of Trial Lawyers of America et al. by *Jeffrey Robert White, John P. Ellis, Joseph E. Wolfe, Russ M. Herman,* and *Michael J. Blachman;* and for the United Mine Workers of America by *Robert H. Stropp, Jr.*

JUSTICE SCALIA delivered the opinion of the Court.‡

These cases call into question the constitutionality of the Department of Labor's administration of that provision of the Black Lung Benefits Act of 1972 which prohibits the acceptance of attorney's fees for the representation of claimants, except such fees as are approved by the Department. Respondent Triplett contends that the Secretary of Labor's manner of implementing this restriction violates the Due Process Clause of the Fifth Amendment because it renders qualified attorneys unavailable and thereby deprives claimants of legal assistance in the prosecution of their claims.

I

The Black Lung Benefits Act of 1972, 83 Stat. 792, as amended, 30 U. S. C. § 901 *et seq.* (1982 ed. and Supp. V), provides federal funds to those who have been totally disabled by pneumoconiosis, a respiratory disease commonly caused by coal mine employment, and to their eligible survivors. See *Pittston Coal Group* v. *Sebben,* 488 U. S. 105, 108 (1988). The Department of Labor (Department) awards benefits after adjudication by a deputy commissioner, and after review (if requested) by an administrative law judge (ALJ), the Benefits Review Board, and a federal court of appeals. 20 CFR §§ 725.410, 725.419(a), 725.481 (1989); 30 U. S. C. § 932(a) (1982 ed., Supp. V) (incorporating 33 U. S. C. § 921(c) (1982 ed.)).

A claimant may be represented throughout these proceedings by an attorney, 20 CFR §§ 725.362, 725.363(a) (1989), and the Act provides that when the claimant wins a contested case the employer, his insurer, or (in some cases, see 30 U. S. C. § 934 (1982 ed.)) the Black Lung Disability Trust Fund shall pay a "reasonable attorney's fee" to the claimant's lawyer. 30 U. S. C. § 932(a) (incorporating 33 U. S. C. § 928(a) (1982 ed.)). The Act also incorporates, however,

---

‡JUSTICE WHITE and JUSTICE BLACKMUN join all but Part II–B of this opinion.

that provision of the Longshore and Harbor Workers' Compensation Act (LHWCA), 44 Stat. 1438, as amended, 33 U. S. C. § 928(d) (1982 ed.), which prohibits an attorney from receiving a fee—whether from the employer, insurer, or Trust Fund, or from the claimant himself—unless approved by the appropriate agency or court. 30 U. S. C. § 932(a) (1982 ed., Supp. V). The Department's regulations invalidate all contractual agreements for fees, see 20 CFR §§ 725.365, 802.203(f) (1989), and the Department will not approve a fee if the claimant is unsuccessful, see *Director, OWCP* v. *Hemingway Transport Inc.*, 1 BRBS 73, 75 (1974). Once the claimant's compensation order becomes final, 33 U. S. C. § 928(a), the attorney may apply to each tribunal before whom the services were performed, 20 CFR § 725.366(a) (1989), and shall be awarded a fee "reasonably commensurate with the necessary work done," § 725.366(b), taking into account "the quality of the representation, the qualifications of the representative, the complexity of the legal issues involved, the level of proceedings to which the claim was raised, the level at which the representative entered the proceedings, and any other information which may be relevant to the amount of fee requested." *Ibid.*

Respondent George R. Triplett (hereinafter respondent) violated these restrictions by receiving unapproved fees. He agreed to represent claimants in exchange for 25% of any award obtained, and collected those fees without the required approval. The Committee on Legal Ethics of the West Virginia State Bar initiated a disciplinary action against respondent for these infractions. The committee, after a hearing, recommended a 6-month suspension, and filed a complaint in the West Virginia Supreme Court of Appeals to enforce that sanction.

That court denied enforcement. Although respondent had not raised such a contention, it occurred to the court that the Act's restriction on payment of fees, as implemented by the Department, might violate the Due Process Clause of the

Fifth Amendment and thus be impermissible as the premise for the disciplinary action. After asking for and receiving supplemental briefing on the issue, it held the Department's implementation of the Act unconstitutional because it "effectively den[ied] claimants necessary access to counsel," and, alternatively, because it "den[ied] qualified claimants the procedural safeguards provided by Congress that are essential to vindicate the right to benefits also granted by Congress." 180 W. Va. 533, 536, 544, 378 S. E. 2d 82, 85, 93 (1988). Two justices dissented, finding the factual record upon which the majority relied "woefully inadequate." *Id.*, at 549, 378 S. E. 2d, at 98.

After issuing this opinion, the court invited the Department to intervene. The Department did so, supplemented the record, and petitioned for rehearing. The court denied the petition in a brief opinion that found the Department's proffered justifications for the fee limitation system, and its new evidence, unpersuasive. *Id.*, at 547, 378 S. E. 2d, at 96.

Both the Department (in No. 88–1671) and the committee (in No. 88–1688) petitioned for certiorari. We granted the petitions. 493 U. S. 807 (1989).

## II

### A

We deal first with the parties' standing. On petitioners' side, the Committee on Legal Ethics has the classic interest of a government prosecuting agency arguing for the validity of a law upon which its prosecution is based. It has preferred charges against respondent that rest upon his disregard of the fee restrictions administered by the Department; those charges cannot be sustained if the restrictions themselves are unlawful. Since the committee has standing, we need not inquire whether the Department does as well. *Bowsher* v. *Synar*, 478 U. S. 714, 721 (1986).

## B

On respondent's side, Triplett invokes not his own legal rights and interests, but those of the black lung claimants who hired him. Respondent's defense to the disciplinary proceeding is that the fee scheme he is accused of violating contravenes those claimants' due process rights because, by prohibiting collection pursuant to voluntary fee agreements and failing to provide adequate alternative means of attorney compensation, it renders claimants unable to obtain legal representation for their black lung claims. Ordinarily, of course, a litigant "'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U. S. 464, 474 (1982) (quoting *Warth* v. *Seldin*, 422 U. S. 490, 499 (1975)). This is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party. See *United States* v. *Payner*, 447 U. S. 727, 731–732 (1980) (criminal defendant "lacks [third-party] standing under the Fourth Amendment to suppress . . . documents illegally seized from" his banker). When, however, enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third-party standing has been held to exist. See *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 954–958 (1984) (professional fundraiser given third-party standing to challenge statute limiting its commission to 25% as violation of clients' First Amendment right to hire him for a higher fee). A restriction upon the fees a lawyer may charge that deprives the lawyer's prospective client of a due process right to obtain legal representation falls squarely within this principle. See *Caplin & Drysdale, Chartered* v. *United States*, 491 U. S. 617,

623–624, n. 3 (1989).** There is no question that a due process right to representation is placed at issue here, since at least one of the claimants who retained respondent received benefits that the Government was seeking to recover as erroneously paid. See 180 W. Va., at 543, n. 31, 378 S. E. 2d, at 92, n. 31; *Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 320, n. 8 (1985).

Accordingly, we find standing on both sides of this action.

## III

In *Walters* v. *National Assn. of Radiation Survivors, supra*, we upheld against due process attack a statutory $10 limitation on attorney's fees payable by veterans seeking disability or death benefits in proceedings before the Veterans' Administration. We began there, as we begin here, by noting the heavy presumption of constitutionality to which a "carefully considered decision of a coequal and representative branch of our Government" is entitled. *Id.*, at 319. We determined in *Walters* that the Government had an interest in administering benefits in an informal and nonadversarial fashion so that claimants would receive the entirety of an award without having to divide it with a lawyer. *Id.*, at 321–323. We accorded that interest "great weight," *id.*, at

---

**We disagree with JUSTICE MARSHALL's view that *ASARCO Inc.* v. *Kadish*, 490 U. S. 605 (1989), renders our inquiry into third-party standing inappropriate. See *post*, at 729–732. Whether a litigant can assert the rights of a third party under a particular statute is "closely related to the question whether a person in the litigant's position would have a right of action on the claim," *Warth* v. *Seldin*, 422 U. S. 490, 500, n. 12 (1975). Thus, while state courts are fully entitled to entertain disputes that would not qualify as cases or controversies under Article III, it is questionable whether they have the power, by granting or denying third-party standing, to create or destroy federal causes of action. See *Haitian Refugee Center* v. *Gracey*, 257 U. S. App. D. C. 367, 381–382, and n. 12, 809 F. 2d 794, 808–809, and n. 12 (1987). We follow longstanding precedent in ascertaining the third-party standing of a respondent in a case arising from state court. See *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 954 (1984); *Barrows* v. *Jackson*, 346 U. S. 249 (1953).

326, and required those challenging the law to make "an extraordinarily strong showing of probability of error under the present system—and the probability that the presence of attorneys would sharply diminish that possibility—to warrant a holding that the fee limitation denies claimants due process of law." *Ibid.* Applying a similar analysis here, we conclude that the fee limitation scheme must be upheld.

The Government pursues an obvious and legitimate interest through the current regime. The regulation of attorney's fees payable by claimants themselves is designed to protect claimants from their "improvident contracts, in the interest not only of themselves and their families but of the public." *Yeiser* v. *Dysart*, 267 U. S. 540, 541 (1925) (upholding similar state limitation). When fees are payable by persons other than the claimants, as Congress has provided, regulation is designed to assure fairness to the employer, carrier, or Trust Fund, and to protect those sources from a depletion that would leave other claimants without a source of compensation. The Government has good reason, moreover, to defer payment until the compensation award is final. A regime of payment immediately upon success at every level, subject to recovery in the event the judgment in favor of the claimant is reversed at a higher level, would impose upon the payor the onerous task of seeking to obtain a refund.

In *Walters* v. *National Assn. of Radiation Survivors*, *supra*, we assumed that the fee limitation would make attorneys unavailable to claimants, but nevertheless upheld the statute because attorneys were not essential to vindicate the claims. Here, we need not reach the latter issue unless respondent has proved what was assumed in that case, viz., that the regime made attorneys unavailable to his prospective clients at the time respondent violated the Act. That showing contains two component parts: (1) that claimants could not obtain representation, and (2) that this unavailability of attorneys was attributable to the Government's fee regime. That is no small burden, and respondent has failed to bear it.

Since the due process issue in this case first arose during the original enforcement proceeding in the West Virginia Supreme Court of Appeals, no lower court had heard evidence or made factual findings. Although the committee had heard evidence concerning respondent's misconduct, it made no findings regarding the effect of the fee regime on the availability of lawyers. The "factual record" upon which the court relied to invalidate this federal program consisted of testimony by two lawyers in the disciplinary proceeding, five affidavits attached to an *amicus* brief to the court, and statements by attorneys in hearings before a House of Representatives Subcommittee in 1985. Since it is critical to our disposition of the case, we shall describe the evidence the court relied upon in some detail.

As to the first issue—unavailability of attorneys—the court relied upon three lawyers' assessments. One stated that "fewer qualified attorneys are accepting black lung claims," and that more claimants are proceeding *pro se.* 180 W. Va., at 541, 378 S. E. 2d, at 90. According to a second attorney, "few attorneys are willing to represent black lung claimants." *Ibid.* A third lawyer's evaluation was not contained in the record, but consisted of his 1985 testimony to the House subcommittee that "many of his colleagues had ' . . . stated unequivocally that they would not take black lung cases . . . . '" *Id.*, at 542, 378 S. E. 2d, at 91 (quoting Hearings on Investigation of Backlog in Black Lung Cases before the Subcommittee on Labor Relations of the House Committee on Education and Labor, 99th Cong., 1st Sess., 188 (1985)). (The court did not mention the testimony of other witnesses before the Subcommittee to the opposite effect. See, *e. g., id.*, at 45.)

This will not do. We made clear in *Walters* that this sort of anecdotal evidence will not overcome the presumption of regularity and constitutionality to which a program established by Congress is entitled. 473 U. S., at 324, n. 11. The impressions of three lawyers that the current system has produced "few" lawyers, or "fewer qualified attorneys"

(whatever that means), and that "many" have left the field, are blatantly insufficient to meet respondent's burden of proof, even if entirely unrebutted.

In unneeded addition, there was rebuttal here—affirmative indication that attorneys willing to take black lung cases were in adequate supply. Data submitted by the Department in support of its petition for rehearing showed that in 1987 claimants were represented by counsel at the ALJ stage in 92% of cases resulting in grant or denial of benefits. Although these statistics are not conclusive of adequate attorney availability (they do not show, for example, the proportion of unrepresented claimants who never reached the ALJ stage), they are the only nonanecdotal evidence in the record, and they powerfully suggest that claimants whose chances of success are high enough to attract contingent-fee lawyers have no difficulty finding them.

Even if respondent had demonstrated an unavailability of attorneys, he would have been obliged further to show that its cause was the regulation of fees. He did not do so. In finding to the contrary, the West Virginia Supreme Court of Appeals relied mainly on statements by attorneys concerning the delay in receiving payment. Of the three lawyers who claimed that there was a shortage of attorneys (see *supra*, at 723), two attributed the shortage, in part, to the delay in payment of fees. 180 W. Va., at 541, 542, 378 S. E. 2d, at 90, 91. See also *id.*, at 536, n. 6, 378 S. E. 2d, at 85, n. 6 (lawyer testified that he had not yet been paid in "three or four" cases in which he had prevailed); *id.*, at 541–542, 378 S. E. 2d, at 90–91 (testimony at congressional hearings that payment was delayed 2–3 years); *id.*, at 541, 378 S. E. 2d, at 90 (lawyer stated that he is owed more than $30,000 in fees that have been awarded but not paid). The court thought this proved that the delay built into the fee-approval system produced the unavailability of attorneys: "In a small, depressed West Virginia town $30,000 is a substantial amount of money for an individual practitioner. In the long run, as John Maynard Keynes once observed, we are all dead. In

the short run, lawyers have offices to run, mortgages to pay and children to educate." *Ibid.*

The court did not explain why the Keynesian imperative of cash-on-the-barrelhead has not eliminated the contingent fee, the very institution respondent seeks to shield from regulation—which itself yields no office funds, mortgage payments, or tuition fees until often lengthy litigation is completed. The answer, of course, is that the contingent fees contracted for are high enough to compensate not only for the contingency but also for the delay until the contingency is resolved. There is no apparent reason why compensation cannot render palatable the additional delay inherent in the Department's approval procedure as well. At one point the West Virginia Supreme Court of Appeals seemed to acknowledge this, asserting that its whole case against the Department's scheme boils down to the fact that the fees are too low: "It is clear from the evidence before us that most lawyers are unwilling to represent black lung claimants because of the inadequate fees awarded by the DOL." *Id.*, at 545, 378 S. E. 2d, at 94. The evidence to support this economic assessment is similar to that for the unavailability of attorneys: small in volume, anecdotal in character, and self-interested in motivation—to wit, a portion of the affidavit of one claimants' attorney who has not abandoned the practice. *Id.*, at 541, 378 S. E. 2d, at 90 (citing Muth affidavit). On the face of the matter, it is difficult to understand how the Department could maintain a system of inadequate fees if it wanted to. The statute itself requires that the fees awarded be "reasonable," see 33 U. S. C. § 928(a) (1982 ed.); 30 U. S. C. § 932(a) (1982 ed., Supp. V), which the agency has interpreted to include a requirement that they compensate for delay, cf. *Hobbs* v. *Director, OWCP*, 820 F. 2d 1528, 1529 (CA9 1987) (applying LHWCA); and where the statutory requirement is not observed, the dissatisfied attorney has a remedy in the appropriate court of appeals, see 33 U. S. C. §§ 921(c), 928(a) (1982 ed.); 30 U. S. C. § 932(a) (1982 ed., Supp. V); *Hobbs* v. *Director, OWCP, supra.*

To establish the requisite causality between the Department's scheme and the (alleged) unavailability of attorneys, the court also relied upon the impressions of the three lawyers (see *supra*, at 723) who attributed the departure of many black lung attorneys to the risk of nonrecovery if the claimant loses. 180 W. Va., at 541–542, 378 S. E. 2d, at 90–91. But as noted above, the existence in this country of a thriving contingent-fee practice demonstrates that this risk can be compensated for—so it comes down once again to the level of compensation. And we note that the Benefits Review Board has construed the regulations of the Secretary of Labor governing the award of attorney's fees to permit consideration of the attorney's risk of going unpaid. See *Risden* v. *Director, OWCP*, 11 BRBS 819, 824 (1980).

Finally, to establish the necessary causality the court relied on the conclusory impressions of interested lawyers as to the effect of the Department's fee regime on the availability of attorneys. One lawyer, for example, whose experience consisted of representing two claimants prior to 1981, said that he did not take black lung cases because of the difficulty in obtaining fees. 180 W. Va., at 536, n. 6, 378 S. E. 2d, at 85, n. 6; Tr. 206. Cf. 180 W. Va., at 542, 378 S. E. 2d, at 91. Perhaps so; but that does not come close to proving that the fee regime dried up the supply of attorneys.

In sum, the evidence relied upon by the West Virginia Supreme Court of Appeals did not remotely establish *either* that black lung claimants are unable to retain qualified counsel *or* that the cause of such inability is the attorney's fee system administered by the Department. The court therefore had no basis for concluding that that system deprives claimants of property without due process of law.

## IV

It is not clear to us what the West Virginia Supreme Court of Appeals meant by what it described as its "independent

basis" for finding a due process violation, which was set forth as follows:

"Congress has conferred upon qualified claimants the right to receive black lung benefits. Congress has also prescribed the remedy (the claims process) to guarantee this right, an essential part of which is the right to counsel. It is, therefore, unconstitutional for the Department of Labor by its regulations to deny qualified claimants the procedural safeguards provided by Congress that are essential to vindicate the right to benefits also granted by Congress." *Id.*, at 544, 378 S. E. 2d, at 93.

It seems to us this adds nothing to the prior analysis except the assertion that the right to counsel, besides being constitutionally required (as we have earlier assumed), was part of the statutory "remedy" prescribed by Congress. If that were so, of course, it would not be necessary to invoke the Due Process Clause, since in denying the right the Department of Labor would be violating the statute. In any case, the asserted basis is not "independent"—or at least not independent of the central proposition that black lung claimants have been deprived of their ability to obtain counsel. Our conclusion that that proposition has not remotely been established disposes of the West Virginia Supreme Court of Appeals' alternative ground of decision as well.

\* \* \*

The judgment of the West Virginia Supreme Court of Appeals is reversed, and the cases are remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

The Government unquestionably has a legitimate interest in preventing lawyers from overcharging program beneficiaries. It may, therefore, enforce regulations prohibiting unreasonable fees. For the reasons stated in my dissent in

*Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 358–372 (1985), however, I remain convinced that such regulation may not be so pervasive as to deny the individual the right to consult and retain independent counsel.   In this action I agree with the Court that respondent Triplett has failed to prove that the regulations have this effect.

With regard to my colleagues' comments on *ASARCO Inc.* v. *Kadish*, 490 U. S. 605 (1989), I add this observation.   In that case we carefully considered the question "whether, under federal standards, the case was nonjusticiable at its outset because the original plaintiffs lacked standing to sue," *id.*, at 612; only thereafter did we address the separate question whether, in the circumstances of that case, the entry of a state-court judgment that caused concrete injury to the parties made it appropriate to examine justiciability at a later stage in the proceedings.   It is entirely appropriate for the Court to follow the same procedure in this action.

Accordingly, I join the Court's opinion and judgment.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins as to Part II, concurring in the judgment.

In the context of an attorney disciplinary action, the West Virginia Supreme Court of Appeals held the provision of the Black Lung Benefits Act of 1972 that governs attorney's fees awarded to counsel for a successful claimant, 83 Stat. 796, as amended, 30 U. S. C. § 932(a) (1982 ed., Supp. V), unconstitutional as applied.   I agree with the Court's decision to reverse this judgment because the evidence supporting it does not establish that the Department of Labor's regulation of attorney's fees deprives black lung claimants of adequate legal assistance.   *Ante*, at 726.   Nevertheless, I write separately to underscore the limited nature of the Court's holding.

I

Before the Court proceeds to the merits of this litigation, it discusses the standing of petitioners *and* respondent Triplett (hereinafter respondent).   I agree that we must examine the

standing of one of the petitioners and that petitioners can seek review in this Court. *Ante,* at 719. I am bewildered, however, by the Court's lengthy discussion of respondent's standing to assert the due process rights of black lung claimants. *Ante,* at 720–721. As long as one of the petitioners has standing and the litigation presents a live case or controversy, this Court has jurisdiction on certiorari from a state-court judgment even if, had the state court applied federal standing requirements, the respondent would have lacked standing. *ASARCO Inc.* v. *Kadish,* 490 U. S. 605, 623–624 (1989). The rule we announced so recently in *ASARCO* renders examination of respondent's standing in the state courts through the lens of federal standing principles completely irrelevant. To the extent that the Court's extended treatment of the issue implies otherwise, it is blatantly inconsistent with our precedent.

In *ASARCO,* the petitioners sought review of a state-court decision on a federal issue in favor of the respondents, who were the plaintiffs in state court. The United States as *amicus curiae* argued that this Court should dismiss the case because the respondents would not have satisfied the standing requirements for bringing the suit in a federal district court. *Id.,* at 620. This Court held, however, that the respondents were not required to meet federal standing requirements. Rather, only the parties "first invoking the authority of the federal courts in th[at] case," the petitioners, were required to prove standing. *Id.,* at 624. See also *id.,* at 617–618.

The *ASARCO* Court began its analysis with the well-established rule that "state courts are not bound to adhere to federal standing requirements [even though] they possess the authority, absent a provision for exclusive federal jurisdiction, to render binding judicial decisions that rest on their own interpretations of federal law." *Id.,* at 617. The Court then reasoned that if it were to examine the respondents' standing and determine that the respondents failed to satisfy federal standing requirements, the only logical course would be to dismiss the case, leaving the state-court judgment in-

tact. See *id.*, at 620–621.[1] The unavailability of federal review of such a state-court judgment would undermine the preclusive effect of that judgment on subsequent litigation between the parties in federal court, because a state-court judgment on a federal issue normally has collateral-estoppel effect in federal court only if the state-court judgment was subject to federal review. *Id.*, at 621–622. A state court that sought to render a *binding* decision on a federal issue would be forced to adhere to federal standing requirements to ensure the availability of federal review. *Id.*, at 622. The *ASARCO* Court concluded, therefore, that dismissing the case on the ground that the respondents lacked standing under federal principles would effectively impose those federal requirements on state courts.

The Court's decision in *ASARCO* clearly forecloses the need for any examination of whether respondent here satisfies federal standing requirements. It is of no importance that the standing issue raised in this case is whether respondent can raise the claims of third parties, whereas the issue in *ASARCO* was whether the respondent taxpayers and teachers association had shown distinct, concrete injury fairly

---

[1] The *ASARCO* Court also considered the possibility of vacating the state-court judgment if it were to find that the respondents did not meet federal standing requirements. *ASARCO Inc.* v. *Kadish*, 490 U. S., at 620. As with dismissal, the "clear effect" of vacating the state-court judgment "would be to impose federal standing requirements on the state courts whenever they adjudicate issues of federal law, if those judgments are to be conclusive on the parties." *Ibid.* The Court concluded, however, that vacating the state-court judgment would not be "a proper exercise of our authority . . . . It would be an unacceptable paradox to exercise jurisdiction to confirm that we lack it and then to interfere with a State's sovereign power by vacating a judgment rendered within its own proper authority." *Ibid.* See also *id.*, at 621, n. 1. Thus, vacating the state-court judgment would not be an appropriate option for the Court in this context. If the Court were to apply federal standing requirements to a respondent and find that he did not satisfy the requirements, the proper course of action would be to dismiss the case, thereby leaving the state-court judgment undisturbed.

traceable to the state statute and likely to be redressed by the requested relief. The general principle that a party must raise his own legal rights and interests and not those of third parties, and the limited exceptions to that principle, are part of the same set of standing requirements devised by this Court to limit the category of parties who may seek relief in federal court. See *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U. S. 464, 474 (1982). Nothing in *ASARCO* suggests that some of the federal standing requirements are applicable to the States, while others are not.[2]

---

[2] Indeed, had the *ASARCO* Court found that third-party standing issues deserved different treatment, it presumably would have distinguished the decision in *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947 (1984), on that ground, as that case involved the issue whether the respondents (again, the plaintiffs in state court below) had standing to raise the rights of third parties. See *id.*, at 954–958. Notably, however, the Court distinguished that case instead on the ground that the Court there had found that the respondents satisfied federal standing requirements, "which obviated any further inquiry." *ASARCO, supra,* at 623, n. 2.

Contrary to the Court's assertion, declining to examine a respondent's third-party standing would not enable state courts "to create . . . federal causes of action." *Ante,* at 721, n. Rather, it would simply allow States to permit a suit under an *established* federal cause of action by a party who might be precluded by federal third-party standing doctrine from bringing the same suit in federal court. This result is precisely what *ASARCO* requires. Whether a party would have a *"right* of action on [a] claim," *Warth* v. *Seldin,* 422 U. S. 490, 500, n. 12 (1975) (emphasis added), is the same question as whether that party has standing. That question is distinct from the question whether any claim—any *cause* of action—exists at all. "Third-party standing" is exactly what one would expect from its name—a doctrine concerning a party's *standing* to assert an existing federal claim.

The only cases of *this* Court that the majority cites in support of its analysis predate our decision in *ASARCO.* The Court of Appeals opinion relied on by the Court for its novel assertion actually supports the applicability of the *ASARCO* analysis to third-party standing. In a discussion of such standing, the lower court stated: "[T]he Supreme Court may review a

Because respondent has not invoked the authority of any federal court, then, federal standing principles are simply inapplicable to him. Under this Court's clear pronouncement in *ASARCO*, the only relevant question for us here is whether one of the petitioners has standing to seek review by this Court of the state court's judgment. As in *ASARCO*, these petitioners have standing because "[t]he state proceedings ended in a . . . judgment adverse to petitioners, an adjudication of legal rights which constitutes the kind of injury cognizable in this Court on review from the state courts." *ASARCO*, 490 U. S., at 618. The injury to the Committee on Legal Ethics is the nonenforcement of its disciplinary action. This injury is directly traceable to the state high court's judgment and can be redressed by a decision of this Court.

---

case from a state court although standing would have been lacking under the Court's prudential rules if the case had been brought in a federal district court." *Haitian Refugee Center* v. *Gracey*, 257 U. S. App. D. C. 367, 381, n. 12, 809 F. 2d 794, 808, n. 12 (1987) (citing *Revere* v. *Massachusetts General Hospital*, 463 U. S. 239 (1983)). See also Monaghan, Third Party Standing, 84 Colum. L. Rev. 277, 292 (1984).

Even if *ASARCO* did not so clearly foreclose, in the context of review of a state-court judgment, application of federal standing requirements to a respondent, it would make no sense to apply the third-party standing doctrine when a state court has already allowed that respondent to raise the rights of third parties and has issued a final judgment on the issues. The limitation on third-party standing permits federal courts to avoid "'unnecessary pronouncement on constitutional issues,'" and assures that the issues raised will be "concrete and sharply presented." *Secretary of State of Maryland* v. *Joseph H. Munson Co., supra,* at 955 (quoting *United States* v. *Raines,* 362 U. S. 17, 22 (1960)) (footnote omitted). This Court's resolution of a constitutional issue cannot be characterized as "unnecessary" once the state court has already rendered a ruling on it in the respondent's favor. See *Revere, supra,* at 243; *supra,* at 729–730. Moreover, the concern that the controversy be "concrete and sharply presented" is fully satisfied by ascertaining that "the judgment of the state court causes direct, specific, and concrete injury to the parties who petition for our review, [and that] the requisites of a case or controversy are also met." *ASARCO, supra,* at 623–624.

## II

Turning to the merits, I find it readily apparent that attorneys are necessary to vindicate claimants' rights under the Black Lung Benefits Act. As the West Virginia Supreme Court of Appeals noted, a black lung claimant must negotiate through a complex regulatory system to receive benefits from either the Black Lung Disability Trust Fund or the responsible mine operator. 180 W. Va. 538, 539, 378 S. E. 2d 82, 88 (1988). The complexity of the system is well documented. See, *e. g.*, Hearings on Investigation of Backlog in Black Lung Cases before the Subcommittee on Labor Standards of the House Committee on Education and Labor, 99th Cong., 1st Sess., 186 (1985) (statement of attorney Thomas Makowski) ("Through the years, the standards have gotten more rigorous with regard to the sufficiency of evidence needed to prove a claim that a miner has black lung. As Congress made standards stricter, the regulations became more and more confusing, not only to the claimants, but to the attorneys and the administrative law judges as well"); *id.*, at 85 (statement of attorney Robert T. Winston, Jr.) (describing the difficult task of developing evidence necessary to support a benefits award); Smith & Newman, The Basics of Federal Black Lung Litigation, 83 W. Va. L. Rev. 763 (1981) (detailing both the intricate regulatory scheme and the types of medical evidence required to prove a case).

More significantly, the black lung process is highly adversarial. Attorneys representing either the Department of Labor or the responsible mine operator actively oppose the award of benefits to a claimant at all levels of the black lung system. Because an operator faces the prospect of paying significant awards, it is often willing to pay substantial legal fees to defend against black lung claims. See Hearings, *supra*, at 22 (testimony of attorney Martin Sheinman). As we acknowledged in *Walters* v. *National Assn. of Radiation Survivors (NARS)*, 473 U. S. 305 (1985), participation of

counsel in administrative proceedings "'inevitably give[s] the proceedings a more adversary cast.'" *Id.*, at 325 (quoting *Wolff* v. *McDonnell*, 418 U. S. 539, 570 (1974)). The black lung benefits system is thus qualitatively different from the Veterans' Administration system, which "is designed to function throughout with a high degree of informality and solicitude for the claimant." *NARS, supra,* at 311.

By specifically providing for lawyers and for the payment of reasonable attorney's fees in black lung cases, 30 U. S. C. § 932(a) (1982 ed., Supp. V) (incorporating 33 U. S. C. § 928(a) (1982 ed.)), Congress acknowledged that legal representation is crucial to black lung claimants' success in this complex, adversarial process. Cf. *NARS, supra,* at 321 (Congress intended that Veterans' Administration system be managed so as to avoid the need for attorneys). An unsophisticated and desperately ill miner, unfamiliar with legal concepts and practices, is at a severe disadvantage when he faces the expert lawyers of the Government or operators without professional assistance of his own. If the system operates so that claimants cannot obtain representation, it undoubtedly denies those claimants their right to due process.

Although representation is necessary to protect claimants' rights under the Act, I agree with the Court that the West Virginia Supreme Court of Appeals had insufficient grounds for holding that the Department of Labor's regulation of attorney's fees deprives claimants of adequate legal assistance.[3] The Court's holding today, however, in no way pre-

---

[3] The Court should not be surprised at the paucity of facts about representation of black lung claimants. When the writ of certiorari was granted, the Court was aware that the issue presented by the litigation had been raised for the first time before the State Supreme Court of Appeals, that it was only indirectly implicated in an attorney disciplinary action, and that the Department of Labor had not been a party when the issue was first resolved. Moreover, it was evident that the Government's late intervention in the case did not result in the development of an extensive record. And, most importantly, the Court was aware that such a record would be required before such a challenge to the entire regulatory scheme

cludes a future constitutional challenge to the Department's implementation of the Act, founded on a more developed factual record.

Finally, I emphasize the Court's observation that the current fee structure should compensate attorneys for any delay in payment and for the contingent nature of claims. *Ante*, at 725–726. See also *Risden* v. *Director, OWCP*, 11 BRBS 819, 824 (1980) (Benefits Review Board holding that fee should account for contingency). The West Virginia Supreme Court of Appeals identified delay and the absence of premiums to offset the risk of loss as the cause of the dearth of attorneys willing to represent claimants. 180 W. Va., at 542, 378 S. E. 2d, at 91. When fee awards do not adequately account for these factors, individual attorneys can challenge the awards in the courts of appeals as violative of the Act's requirement of "reasonable" fees. *Ante*, at 725. If an attorney or claimant alleges that the regulations governing attorneys' fees do not allow the Department to award "reasonable" fees as required by the Black Lung Benefits Act, those regulations also may be challenged.

Although the allegations in the sparse record before us raise legitimate concerns that black lung claimants may not be able to retain legal counsel and the suspicion that this inability may stem from the Department of Labor's regulation of attorney's fees, concerns and suspicions are insufficient to justify striking down on constitutional grounds "the duly enacted and carefully considered decision of a coequal and representative branch of our Government." *NARS, supra*, at 319. Accordingly, I concur in the Court's decision today to reverse the judgment of the West Virginia Supreme Court of Appeals.

---

could be evaluated properly. See *Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 324, n. 11 (1985). The Court therefore should not have granted the petition in the first place, or it should have dismissed the writ as improvidently granted as soon as oral argument made manifestly clear the insufficiency of the record.

Separate statement of JUSTICE BRENNAN.

I write separately to explain why it is prudent that we not resolve the issue whether respondent Triplett (hereinafter respondent) has standing in these cases. As JUSTICE MARSHALL explains, see *ante*, at 728–732, we held in *ASARCO Inc.* v. *Kadish*, 490 U. S. 605 (1989), that if a petitioner in a case arising from a state court satisfies Article III's core standing requirements, we need not inquire whether the respondent also satisfies these requirements. Nevertheless, today the Court still inquires whether respondent is entitled to "'rest his claim . . . on the legal rights or interests of third parties,'" *ante*, at 720 (citations omitted), an inquiry heretofore characterized as a "prudential" standing limitation on the jurisdiction of federal courts.[1] The Court suggests that there might be a "third-party claim" exception to the rule of *ASARCO* because the question whether a litigant may assert the rights of a third party is "'closely related to the question whether a person in the litigant's position would have a right of action on the claim.'" *Ante*, at 721, n., quoting *Warth* v. *Seldin*, 422 U. S. 490, 500, n. 12 (1975). I take the Court to be suggesting that the traditional "third-party standing" inquiry might be reformulated as a straightforward question of substantive federal law: whether the litigant is entitled to raise the legal claim asserted, either because her own legal rights are at stake or because principles of federal law justify her status as a "private attorney general" on behalf of those absent parties whose rights are at stake.

Perhaps the Court's suggestion may provide a more coherent explanation for what is now perceived as a confusing area of standing doctrine.[2] But this suggested recharacterization, even if ultimately persuasive, would seem to depart from

---

[1] See *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U. S. 464, 474 (1982).

[2] See, *e. g.*, Fletcher, The Structure of Standing, 98 Yale L. J. 221, 243–247 (1988); Monaghan, Third Party Standing, 84 Colum. L. Rev. 277 (1984).

our present understanding,[3] and the issue has been neither briefed nor argued here. Because the requisites of "third-party standing" doctrine are satisfied, *ante*, at 720–721, it is prudent that we not decide today whether to distinguish *ASARCO* on the basis of this recharacterization.[4]

---

[3] The Court correctly notes that, in some cases, we have observed a similarity between the "third-party standing" inquiry and a "right of action" inquiry. See, *e. g.*, *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975) ("In such instances [where the Court allowed litigants to raise the legal rights of third parties], the Court has found, in effect, that the constitutional or statutory provision in question implies a right of action in the plaintiff"). In *Warth* itself, however, we described the "third-party standing" inquiry as a "rule of self-governance . . . subject to exceptions." *Id.*, at 509. Such language suggests that we have considered the "third-party standing" inquiry to turn on the prudence of exercising jurisdiction rather than the content of substantive federal law. See also, *e. g.*, *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 956 (1984) ("[T]here are situations where competing considerations outweigh any prudential rationale against third-party standing, and . . . this Court has relaxed the prudential-standing limitation when such concerns are present"); *Craig* v. *Boren*, 429 U. S. 190, 193 (1976) ("[O]ur decisions have settled that limitations on a litigant's assertion of *jus tertii* . . . stem from a salutary 'rule of self-restraint'").

Moreover, the natural consequence of adopting the Court's suggested approach—that were "third-party standing" requirements not satisfied here, we would set aside the state-court judgment for its error in presuming that respondent was entitled as a matter of federal substantive law to raise the due process challenge—was expressly rejected in *Revere* v. *Massachusetts General Hospital*, 463 U. S. 239 (1983). There we explained that the Massachusetts "Supreme Judicial Court, of course, is not bound by the prudential limitations on *jus tertii* that apply to federal courts." *Id.*, at 243.

[4] Even assuming the Court's suggested approach were persuasive, I do not understand why we ought to address *sua sponte* the question whether respondent is entitled to litigate his due process challenge. If this is indeed a question of substantive federal law and not one of Article III jurisdiction, then we should address this question only if petitioners argued unsuccessfully below that respondent was not entitled to raise the constitutional claim and petitioners sought certiorari on this legal question. But petitioners did not do so in this case, nor did they raise the issue in their briefs or at oral argument.