**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2387**

MARY L. FOX, on behalf of Gary N. Fox, deceased,

Petitioner,

v.

ELK RUN COAL COMPANY, INCORPORATED; DIRECTOR, OFFICE OF
WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF
LABOR,

Respondents.

**No. 12-2402**

ELK RUN COAL COMPANY, INCORPORATED,

Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR; MARY L. FOX, on behalf of Gary
N. Fox, deceased,

Respondents.

On Petitions for Review of Orders of the Benefits Review Board.
(11-0793-BLA; 09-0438-BLA)

Argued: October 29, 2013          Decided: January 3, 2014

Before TRAXLER, Chief Judge, and WILKINSON and FLOYD, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Traxler and Judge Floyd joined.

_____

**ARGUED**: Allan Norman Karlin, Morgantown, West Virginia, for Petitioner/Cross-Respondent. Alvin Lee Emch, JACKSON KELLY, PLLC, Charleston, West Virginia, for Respondent/Cross-Petitioner Elk Run Coal Company, Incorporated. **ON BRIEF**: John Cline, Piney View, West Virginia; Sarah W. Montoro, ALLAN N. KARLIN & ASSOCIATES, Morgantown, West Virginia, for Petitioner/Cross-Respondent. Kathy Lynn Snyder, JACKSON KELLY, PLLC, Morgantown, West Virginia, for Respondent/Cross-Petitioner Elk Run Coal Company, Incorporated.

_____

WILKINSON, Circuit Judge:

Appellant Mary Fox contends that Elk Run Coal Company committed fraud on the court and thereby deprived her husband, coal miner Gary Fox, of nearly a decade of benefits under the Black Lung Benefits Act ("BLBA"). The Benefits Review Board ("BRB") found that Elk Run's conduct was not sufficiently egregious to meet the high bar for a claim of fraud on the court because it did not amount to an intentional design aimed at undermining the integrity of the adjudicative process under the BLBA. We now affirm and find that Elk Run's conduct, while hardly admirable, did not, under clear Supreme Court and circuit precedent, demonstrate the commission of a fraud upon the court. See, e.g., Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944); Great Coastal Express, Inc. v. Int'l Bhd. of Teamsters, 675 F.2d 1349 (4th Cir. 1982).

I.

A.

Pneumoconiosis, commonly known as "black lung," is a progressive and irreversible pulmonary condition that can afflict those regularly exposed to coal dust. Mullins Coal Co. v. Dir., OWCP, 484 U.S. 135, 138 (1987). In recognition of the effects of this disease, Congress adopted the BLBA to require private coal companies to compensate miners and their families.

3

*Id.* at 138-39. The BLBA permits coal workers or their surviving dependents to apply for benefits by filing a claim with the District Director of the U.S. Department of Labor's Office of Workers' Compensation Programs ("Director"). 20 C.F.R. §§ 725.301-725.423. In order to award benefits, the Director must find that the coal worker has pneumoconiosis arising out of his or her coal mine employment, is totally disabled, and the pneumoconiosis substantially contributed to the worker's disability. *Id.* § 725.202(d).

Once the Director makes an initial finding on whether the claimant is entitled to benefits, either party may request an evidentiary hearing before an ALJ. *Id.* §§ 725.401-725.480. Such a request initiates an adversarial process under the Administrative Procedure Act ("APA"). *Id.* § 725.452(a); *Elm Grove Coal Co. v. Dir., OWCP*, 480 F.3d 278, 283 (4th Cir. 2007) (finding that the BLBA incorporates the APA's administrative adjudication procedures); *see also* *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 733 (1990) (Marshall, J., concurring) (noting that "the black lung process is highly adversarial"). To encourage coal workers to pursue their claims with the aid of counsel, the BLBA includes a provision for reasonable attorney's fees if the claimant is successful. 30 U.S.C. § 932(a) (incorporating 33 U.S.C. § 928(a)). This adversarial posture between the parties remains in the event that either party

4

appeals the ALJ's ruling to the BRB, 20 C.F.R. § 725.481, as well as in any subsequent appeals to the circuit covering the state in which the claimant allegedly contracted pneumoconiosis, 33 U.S.C. § 921(c).

B.

Gary Fox worked in West Virginia as a coal miner for over 30 years before his death from coal worker's pneumoconiosis in 2009.[1] X-rays taken of his chest in 1997 revealed an unidentified mass in his right lung. In 1998, a pathologist in West Virginia named Dr. Gerald Koh concluded from surgical samples that, among other things, the mass was an "inflammatory pseudotumor," but did not diagnose pneumoconiosis. Nonetheless, Fox filed a claim in 1999 for benefits under the BLBA which the Director granted in early 2000. Because Fox was employed by Elk Run at the time of his claim, Elk Run exercised its right under the BLBA to request a hearing before an ALJ.

Prior to the hearing, Elk Run obtained the pathology slides from Fox's 1998 surgical procedure and provided them to two additional pathologists: Dr. Richard Naeye and Dr. P. Raphael Caffrey. Both pathologists wrote reports summarizing their conclusions. Elk Run also requested opinions from several

_____

[1] Gary Fox's surviving spouse and successor-in-interest, Mary Fox, took over his claim after his death and all references to the appellant as "Fox" after his passing are to her.

5

radiologists and submitted them, along with Dr. Koh's report but not Dr. Naeye's or Dr. Caffrey's, to four pulmonary specialists. The four pulmonologists concluded that, based on the evidence available to them, Fox likely did not have coal worker's pneumoconiosis at that time.

The evidentiary hearing occurred on September 19, 2000, at which Fox appeared <u>pro se</u> and Elk Run was represented by counsel. The ALJ informed Fox that he had a right to representation and, when Fox responded that he had not been able to find an attorney, the ALJ confirmed his competency and willingness to proceed without counsel. (Fox had, however, procured an attorney to represent him in his concurrent West Virginia worker's compensation claim related to pneumoconiosis). During the hearing, the ALJ admitted into the record the reports of Dr. Koh, the radiologists, and the pulmonologists, along with additional exhibits offered by Elk Run. Fox offered only his own testimony. Elk Run did not submit the reports of Dr. Naeye or Dr. Caffrey, nor did it disclose their existence to Fox or the ALJ. The ALJ denied Fox's claim on January 5, 2001, finding that Fox failed to show he had pneumoconiosis or that he was totally disabled due to pneumoconiosis. Fox did not appeal.

Fox retained counsel and filed a new claim on November 8, 2006. The Director again found him eligible for benefits and Elk Run once more requested an evidentiary hearing. But this

6

time Fox, through his attorney, conducted vigorous discovery and requested that Elk Run hand over the 1998 pathology slides and disclose additional documents and reports pertaining to Fox's medical condition. After some foot dragging, Elk Run admitted liability for Fox's 2006 claim and disclosed the slides and several documents to Fox, including the pathology reports of Dr. Naeye and Dr. Caffrey. Recognizing that the BLBA bars any entitlement to benefits before the ALJ's 2001 judgment became final, 20 C.F.R. § 725.309(c)(6), Fox moved to set aside that judgment, contending that Elk Run had committed fraud on the court because it had not disclosed the Naeye and Caffrey reports to its expert pulmonologists.

On July 20, 2011, the ALJ found that the Naeye and Caffrey reports diagnosed "complicated pneumoconiosis," J.A. 416, and thus "clearly contradicted Dr. Koh's finding of an inflammatory pseudotumor," J.A. 427. The ALJ then determined that Elk Run's failure to disclose the Naeye and Caffrey reports to its other expert witnesses tainted their conclusions and that, while "perhaps initially not concocted as such," J.A. 427, Elk Run's "actions, taken as a whole, constitute a scheme to defraud," J.A. 429. Dismissing Elk Run's arguments that its attorneys were not defrauding the court but rather zealously representing their client, the ALJ ruled that Elk Run had committed fraud on

7

the court, set aside the 2001 judgment, and awarded Fox benefits dating back to January 1997.

On appeal, the BRB accepted the ALJ's factual findings, but held that Elk Run's "conduct did not rise to the level of fraud on the court" because Elk Run "did not engage in a deliberate scheme to directly subvert the judicial process." J.A. 444. Because Elk Run had admitted liability for Fox's 2006 claim, the BRB held that Fox was entitled to benefits beginning in June 2006. One member of the BRB panel dissented, writing that Elk Run's conduct constituted fraud on the court because it had failed to disclose all the relevant medical evidence to its own experts.

II.

Fox asks this court to set aside the ALJ's 2001 judgment, which would have the effect of moving the onset of her entitlement to benefits under the BLBA from June 2006 to January 1997. She claims that the judgment was fraudulently procured because, although Elk Run knew that the Naeye and Caffrey reports diagnosed her husband with pneumoconiosis, it intentionally failed to disclose those reports to its own experts and later relied on the conclusions of those experts to controvert Fox's 1999 claim that he had pneumoconiosis. While Elk Run's conduct over the course of this litigation warrants

8

nothing approaching judicial approbation, we are unable to say that it rose to the level of fraud on the court.

The standard of review in cases under the Black Lung Benefits Act is well settled. We sustain an ALJ's factual findings if there is "substantial evidence" on the record to support them. Harman Min. Co. v. Dir., OWCP, 678 F.3d 305, 310 (4th Cir. 2012). Fox maintains that, whereas the BRB should have affirmed the ALJ's ruling on substantial evidence grounds, it instead improperly held that the ALJ erred "as a matter of law." J.A. 444. However, the operative facts here are simply not disputed and only the application of the fraud on the court doctrine is at issue. That issue is one of law, which we review de novo. See Westmoreland Coal Co. v. Cox, 602 F.3d 276, 282 (4th Cir. 2010).

A.

Fraud on the court is not your "garden-variety fraud." George P. Reintjes Co. v. Riley Stoker Corp., 71 F.3d 44, 48 (1st Cir. 1995). Ordinarily, when a party believes that its opponent has obtained a court ruling by "fraud" or "misrepresentation," it may move for relief under Federal Rule of Civil Procedure 60(b)(3). Litigants have one year following the final judgment in which to make a Rule 60(b)(3) motion. Fed. R. Civ. P. 60(c)(1). As we recognized in Great Coastal Express, Inc. v. International Brotherhood of Teamsters, this

9

one year limit balances the competing interests of relieving an aggrieved party from the hardships of an unjustly procured decision against the deep "[r]espect for the finality of judgments . . . engrained in our legal system." 675 F.2d 1349, 1354-55 (4th Cir. 1982). Therefore, after a year, the public's powerful interest in leaving final judgments undisturbed generally triumphs and "ordinary" fraud will not suffice to set aside a ruling. Id. at 1355.

But, as often happens with a rule, there is an exception. The savings clause in Rule 60(d)(3) permits a court to exercise its inherent equitable powers to obviate a final judgment after one year for "fraud on the court." The Supreme Court addressed this doctrine in Hazel-Atlas Glass Co. v. Hartford-Empire Co., when it set aside a fraudulently obtained ruling by finding that it was the product of one party's "deliberately planned and carefully executed scheme" that severely undermined the "integrity of the judicial process." 322 U.S. 238, 245-46 (1944). The Court held that ordinary cases of fraud would not suffice to violate the "deep rooted policy in favor" of finality but that, on the facts before it, the aggrieved party could not "have been expected to do more than it did to uncover the fraud." Id. at 244, 246. Moreover, the harm of the fraud in Hazel-Atlas was so broad that it "involve[d] far more than an injury to a single litigant," but was rather a "wrong against

10

the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." Id. at 246. Thus, not only must fraud on the court involve an intentional plot to deceive the judiciary, but it must also touch on the public interest in a way that fraud between individual parties generally does not.

We have likewise underscored the constricted scope of the fraud on the court doctrine. In Great Coastal, we held that fraud on the court is a "nebulous concept" that "should be construed very narrowly" lest it entirely swallow up Rule 60(b)(3). 675 F.2d at 1356. We stressed that this doctrine should be invoked only when parties attempt "the more egregious forms of subversion of the legal process . . . , those that we cannot necessarily expect to be exposed by the normal adversary process." Id. at 1357. Even the "perjury and fabricated evidence" present in Great Coastal, which were "reprehensible" and unquestionable "evils," were not adequate to permit relief as fraud on the court because "the legal system encourages and expects litigants to root them out as early as possible." Id. Instead, the doctrine is limited to situations such as "bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its

11

ability to function impartially is directly impinged." Id. at 1356.

In succeeding cases we have emphasized this circumscribed understanding of fraud on the court. In Cleveland Demolition Co. v. Azcon Scrap Corp., we held that fraud on the court involves "corruption of the judicial process itself" and thus the doctrine cannot support allegations involving a "routine evidentiary conflict." 827 F.2d 984, 986 (4th Cir. 1987) (internal quotation marks omitted). To hold otherwise, we found, would "seriously undermine[] the principle of finality" by permitting "parties to circumvent the Rule 60(b)(3) one-year time limitation." Id. at 987. Later, in In re Genesys Data Technologies, Inc., we recognized that "[c]ourts and authorities agree that fraud on the court must be narrowly construed" or it would "subvert the balance of equities" contained within Rule 60(b)(3). 204 F.3d 124, 130 (4th Cir. 2000) (internal quotation marks omitted). "Because the power to vacate a judgment for fraud upon the court is so free from procedural limitations, it is limited to fraud that seriously affects the integrity of the normal process of adjudication." Id. (internal quotation marks omitted). We therefore held that "[f]raud between parties" would not be fraud on the court, "even if it involves [p]erjury by a party or witness." Id. (internal quotation marks omitted).

12

B.

Proving fraud on the court thus presents, under Supreme Court and circuit precedent, a very high bar for any litigant. Fox has not met that high standard in this case. Elk Run's alleged fraud does not directly impact the integrity and workings of the black lung benefits process in the way that Hazel-Atlas and Great Coastal require. Fox does not allege that Elk Run bribed or otherwise improperly influenced any officials involved in the benefits process, nor does she claim that Elk Run encouraged or conspired with its witnesses to suborn perjury. Rather, she argues that Elk Run's nondisclosure of certain pathology reports to its own experts "instills uncertainty and cynicism" into the black lung benefits system. But that is not harmful enough to be a "wrong against the institutions set up to protect and safeguard the public." Hazel-Atlas, 322 U.S. at 246. Indeed, if alleged "uncertainty and cynicism" were the standard for fraud on the court, we find it difficult to imagine how any claim of fraud in an adjudicatory proceeding would not fall under its extensive canopy. Every litigant could be expected to inflate its personal loss into an alleged systemic harm. Elk Run's nondisclosure simply does not "amount[] to anything more than fraud involving injury to a single litigant." Gleason v. Jandrucko, 860 F.2d 556, 560 (2d Cir. 1988).

13

Conduct that is not exemplary need not undermine the "integrity of the court and its ability to function impartially" within the meaning of "fraud on the court." Great Coastal, 675 F.2d at 1356. The adversary process exists because it permits each side to present its own case as well as to test its opponent's in order to expose vulnerabilities of every sort and variety. It is, to some extent, a self-policing mechanism. The relevant provision of the APA contains no requirement that a party present the most probative evidence in its possession; instead, it is permitted to offer any evidence it would like so long as that evidence is relevant. 5 U.S.C. § 556(d) ("Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence."). Therefore, while the ALJ found the Naeye and Caffrey opinions were "more probative" than Dr. Koh's, J.A. 428, Elk Run was under no obligation to advance those reports as evidence because someone else may believe them superior.

Thus it falls to each party to shape and refine its case, subject of course to the risk that its adversary will discredit it. One elementary component of the adversary system is cross-examination, which the Supreme Court has recognized is the "greatest legal engine ever invented for the discovery of truth." California v. Green, 399 U.S. 149, 158 (1970) (internal

14

quotation marks omitted). Cross-examination helps to safeguard against the ALJ's concern that, if parties were free to withhold probative medical evidence from their experts, "an expert medical opinion could never be accepted as a reliable diagnosis." J.A. 430. A party relying on weak evidence to sustain its case runs the risk that its experts will crumble upon cross-examination or otherwise be impeached by the opposing party. The presence of that deterrent means, however, that routine evidentiary disputes as this cannot clear the high bar for an action for fraud on the court. Cleveland Demolition, 827 F.2d at 986.

In fact, this case illustrates the principle. The ALJ recognized that Elk Run's case in the 1999 claim was vulnerable when it found that Elk Run "built its case around Dr. Koh's pathology report." J.A. 428. Fox had the right to cross-examine Dr. Koh regarding his qualifications and conclusions. 5 U.S.C. § 556(d) ("A party is entitled to . . . conduct such cross-examination as may be required for a full and true disclosure of the facts."). He had the right to cross-examine Elk Run's other experts to test their understanding of and reliance on Dr. Koh's report. He had the right to question the apparent lack of additional pathology reports. He had the right to present a contradictory medical opinion from a pathologist of his own choosing. That he did none of those things is not so

15

much an indictment of the adversary system as it is a statement that he did not fully avail himself of it.

Fox admits that an attorney experienced in black lung claims would have recognized that "something was fundamentally wrong" with how Elk Run presented its case as to Fox's 1999 claim. Appellant's Resp. 16. Indeed, once Fox retained an attorney for his 2006 claim, he pursued discovery and was successful in obtaining the pathology reports and 1998 pathology slides. Elk Run's alleged misconduct could have been "exposed by the normal adversary process." Great Coastal, 675 F.2d at 1357. Our legal system therefore expected Fox to uncover Elk Run's conduct during the adjudication of Fox's 1999 claim or, if it amounted to Rule 60(b)(3) fraud, at most one year after the 2001 judgment became final. George P. Reintjes, 71 F.3d at 49 (holding that even perjury is "a common hazard of the adversary process with which litigants are equipped to deal through discovery and cross-examination and, where warranted," a Rule 60(b)(3) motion).

Fox contends that the black lung benefits process is somehow different from an ordinary adversarial procedure and, in effect, urges us to alter that process by finding that Elk Run had a duty to share with its experts all of the medical information it had obtained. To that end, the ALJ found that Elk Run had a duty to "provide accurate evidence to its expert

16

witnesses." J.A. 430. But that duty--and the judicial supervision that would inescapably go with it--would carry ALJs far afield from their role as neutral arbiters. See Underwood v. Elkay Min., Inc., 105 F.3d 946, 949 (4th Cir. 1997) (finding that the ALJ in a BLBA proceeding is the "trier of fact" charged with "evaluat[ing]" and "weigh[ing] the evidence") superseded on other grounds as recognized in Elm Grove, 480 F.3d at 291. Any duty imposed upon a party to furnish its expert witnesses certain documents would improperly impinge on that party's right to develop its own evidence, handle its own experts, and present its own case. See, e.g., Hickman v. Taylor, 329 U.S. 495, 511 (1947) (holding in the context of the work product privilege that the adversary system requires a party's attorney be permitted to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference"). Fox's proposed duty would launch an infinite number of new challenges by parties alleging their opponents' breach of the duty, thereby thrusting judges deep into the heart of the adversary process and the attorney-client relationship.

What Fox requests is something akin to a civil Brady rule, where parties would be obligated to disclose or at least identify any evidence helpful to their opponent regardless of whether it is privileged. See Brady v. Maryland, 373 U.S. 83,

17

86 (1963) (finding that due process requires the government to disclose to a criminal defendant information favorable to his defense).  But courts have only in rare instances found <u>Brady</u> applicable in civil proceedings, mainly in those unusual cases where the potential consequences "equal or exceed those of most criminal convictions."  <u>Demjanjuk v. Petrovsky</u>, 10 F.3d 338, 354 (6th Cir. 1993); <u>see also</u> <u>Brodie v. Dep't of Health and Human Servs.</u>, No. 12-1136 (RMC), slip op. at 9-10 (D.D.C. June 27, 2013) (examining cases and declining to apply <u>Brady</u> in an administrative hearing).  We see no reason to expand <u>Brady</u> to this administrative adjudication.  In a criminal case, the government's duty to disclose under <u>Brady</u> arises from the obligation of the prosecutor not simply to convict, but to see that justice is done.  <u>United States v. Agurs</u>, 427 U.S. 97, 110-11 (1976).  The civil context is not analogous.  There, the basic duty of an attorney to his or her client is not offset by the countervailing duty a government prosecutor has to exercise in the interest of justice his or her awesome and extraordinary powers.

Fox points out that her husband proceeded <u>pro se</u> before the administrative tribunal in his 1999 claim, but that point, while appealing, carries only so far.  Fox was instructed of his right to an attorney who would receive compensation if his claim was successful.  He had retained counsel for his state benefits

18

claim, demonstrating that he knew the advantages of professional representation. It is true that Fox's pro se presentation of his 1999 claim did not match the counselled presentation of his 2006 claim. But the narrow confines of fraud on the court doctrine have never permitted claimants to relitigate old claims they have lost, simply because a better prior case presentation might have resulted in an earlier success. Finally, courts are not at liberty to exceed the parameters of what Congress has provided. Of course, Congress might have provided counsel to miners under the BLBA at public expense, but it did not do so. Instead, Congress left to the practiced judgment of attorneys which claims for benefits they thought were most likely to be successful. And in doing so, Congress adopted within the BLBA the dynamics of the adversary process. See Triplett, 494 U.S. at 733 (Marshall, J., concurring) ("Because an operator faces the prospect of paying significant awards, it is often willing to pay substantial legal fees to defend against black lung claims."); Treadway v. Califano, 584 F.2d 48, 49 (4th Cir. 1978) (holding that in its 1972 amendments to the BLBA, Congress made the benefits adjudication process "adversarial" because "the burden of the payment might be imposed upon an individual coal operator or upon the industry"). Recognizing Fox's claim would alter Congress's adversary design beyond our authority to do so.

19

Elk Run insists it has done nothing wrong and that it has proceeded properly at every turn. It maintains that the medical evidence in general and Dr. Naeye's pathology report in particular are more ambiguous than Fox makes them out to be. It further notes that no party is bound by every conclusion of the experts it may hire. See Horn v. Jewell Ridge Coal Corp., 6 Black Lung Rep. (Juris) 1-933, 1-937 (Ben. Rev. Bd. 1984). Finally, it contends that it did not have any intent to defraud the court by declining to disclose the reports of Dr. Naeye and Dr. Caffrey because, as non-testifying consulting experts, their reports were protected by the work product privilege--a protection that would have been lost if the reports had been provided to Elk Run's testifying experts. See Elm Grove, 480 F.3d at 303 n.25. We see no reason to address these matters when a plain, narrow disposition is available. We bestow no blessing and place no imprimatur on the company's conduct, other than to hold that it did not, under a clear chain of precedent, amount to a fraud upon the court.

III.

For the foregoing reasons, the judgment of the Benefits Review Board is affirmed.

AFFIRMED

20